No. 24-4051

---

IN THE

United States Court of Appeals for the Tenth Circuit

---

CHRISTOPHER C. FUCCI, et al.,

*Plaintiffs-Appellees,*

v.

FIRST AMERICAN TITLE INSURANCE COMPANY, a Nebraska corporation, and KIRSTEN PARKIN,

*Defendants-Appellants.*

---

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH
AT SALT LAKE CITY

The Honorable David Barlow | Case No. 2:20-CV-00004

---

**APPELLANTS' OPENING BRIEF**

---

ORAL ARGUMENT REQUESTED

DENTONS US LLP

DOUGLAS W. HENKIN
1221 Avenue of the Americas
New York, New York  10020-1089
Tel: (212) 768-6832
douglas.henkin@dentons.com

DENTONS DURHAM JONES PINEGAR,
P.C.
DAVID W. TUFTS
J. TAYLER FOX
111 South Main, Suite 2400
Salt Lake City, UT  84111
Tel: (801) 415-3000
david.tufts@dentons.com
tayler.fox@dentons.com

*Counsel for Defendants-Appellants*
*First American Title Insurance*
*Company and Kirsten Parkin*

STRONG & HANNI, P.C.

REID W. LAMBERT
ZACHARY T. SHIELDS
102 South 200 East, Suite 800
Salt Lake City, UT  84111
Tel: (801) 532-7080
rlambert@strongandhanni.com
zshields@strongandhanni.com

*Counsel for the Plaintiffs-Appellees*

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF PRIOR OR RELATED APPEALS ..........................................1

INTRODUCTION ...................................................................................2

STATEMENT OF JURISDICTION ..........................................................3

STATEMENT OF THE ISSUES ...............................................................4

STATEMENT OF THE CASE.....................................................................5

STATEMENT OF FACTS ..........................................................................6

    A.    The PSAs.....................................................................................7

    B.    Plaintiffs' Allegations .................................................................10

    C.    The Rockwell Bankruptcy..........................................................11

    D.    The FA Defendants Move to Compel Arbitration ............................12

STANDARD OF REVIEW ......................................................................14

SUMMARY OF ARGUMENT .................................................................14

ARGUMENT .........................................................................................17

I.     FEDERAL LAW FAVORS ARBITRATION AND REQUIRES ANY
      DOUBTS TO BE RESOLVED IN FAVOR OF ARBITRATION ...........17

II.    THE DISTRICT COURT ERRED IN NOT COMPELLING
      ARBITRATION UNDER THE PSAs. .......................................................18

    A.    The FA Defendants Are Entitled to Compel Arbitration
        as Parties to or Third-Party Beneficiaries of the PSAs .....................19

        1.    The FA Defendants are Parties to the PSAs and are
            Entitled to Compel Arbitration on that Basis .........................19

        2.    The FA Defendants Satisfy The Requirements to
            Compel Arbitration As Third- Party Beneficiaries of the
            PSAs....................................................................................22

        3.    The FA Defendants Did Not Waive The Third-Party
            Beneficiary Argument............................................................28

    B.    The FA Defendants Are Entitled to Compel Arbitration As
        Alleged Agents of Rockwell ...........................................................29

    C.    The FA Defendants Are Entitled to Compel Arbitration Under
        the PSAs Pursuant to Equitable Estoppel .......................................32

1. The FA Defendants are Entitled to Compel Arbitration Because, as the District Court Acknowledged, Plaintiffs' Claims are Premised on the Terms of the PSAs. ....................33

2. The FA Defendants are Entitled to Compel Arbitration Because Plaintiffs Allege Concerted Misconduct Between the FA Defendants and Rockwell. ..........................................36

III. THE DISTRICT COURT ERRED IN CONCLUDING THAT ROCKWELL WAIVED THE FA DEFENDANTS' ARBITRATION  RIGHTS UNDER THE PSAS ......................................41

A. The District Court Improperly Placed the Burden on the FA Defendants to Disprove Waiver Instead of Requiring Plaintiffs to Prove Waiver...................................................................41

B. Neither Rockwell nor Plaintiffs Could Waive the FA Defendants' Vested Rights under Ohio or Florida Contract Law .......................42

C. The Purported Waiver was Invalid under the Terms of the PSAs....44

D. The District Court Improperly Found That Rockwell or its Bankruptcy Trustee Waived the FA Defendants' Vested Property Rights......................................................................48

CONCLUSION................................................................................51

CERTIFICATE OF COMPLIANCE....................................................53

CERTIFICATE OF SERVICE ............................................................54

ATTACHMENT A ............................................................................55

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

**Cases**

*Accord Borsack v. Chalk & Vermilion Fine Arts, Ltd*., 974 F. Supp. 293
   (S.D.N.Y. 1997)...................................................................................21

*Am. Express Co. v. Italian Colors Rest.,* 570 U.S. 228 (2013)............................17

*AP Atl., Inc. v. Silver Creek St. Augustine, LLP*, 266 So. 3d
   865 (Fla. Dist. Ct. App. 2019) ................................................................ 33, 35

*Armas v. Prudential Sec., Inc.,* 842 So. 2d 210 (Fla. Dist. Ct. App. 2003).... 34, 35

*Armbruster v. Alvin*, 437 So. 2d 725 (Fla. Dist. Ct. App. 1983) ..........................20

*Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009) ................................ 14, 38

*Ben-Yishay v. Mastercraft Dev., LLC*, No. 08-14046-CIV, 2009 WL
   6387928 (S.D. Fla. Dec. 14, 2009)...........................................................39

*Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v.
   MedPartners, Inc.,* 203 F.R.D. 677 (S.D. Fla. 2001).......................................36

*Butner v. United States*, 440 U.S. 48 (1979) ................................................ 49, 50

*Caruso v. Nat'l City Mtg. Co*., 931 N.E.2d 1167 (Ohio Ct. App., 1st Dist.
   2010) .......................................................................................................27

*Chitlik v. Allstate Ins. Co.*, 34 Ohio App. 2d 193, 299 N.E.2d 295 (Ohio
   Ct. App. 1973) .........................................................................................22

*Citizen Potawatomi Nation v. Oklahoma*, 881 F.3d 1226 (10th Cir. 2018).........17

*Conseal Int'l Inc. v. Neogen Corp.*, 488 F. Supp. 3d 1257 (S.D. Fla. 2020) ........20

*Cradock v. Cooper*, 123 So. 2d 256 (Fla. Dist. Ct. App. 1960) ...........................34

*E.B. Roberts Const. Co. v. Concrete Contractors, Inc.*, 704 P.2d 859
   (Colo. 1985)...........................................................................................25

*First Protective Ins. Co. v. Ahern*, 278 So. 3d 87 (Fla. Dist. Ct. App.
   2019).......................................................................................................42

*Fla. Power & Light Co. v. Rd. Rock, Inc.*, 920 So. 2d 201 (Fla. Dist. Ct.
   App. 2006)...............................................................................................22

*GE Energy Conversion France SAS, Corp. v. Outokumpu Stainless USA,
   LLC*, 140 S. Ct. 1637 (2020) ................................................... 38, 39, 51

*Genaw v. Lieb*, 2005 WL 435211 (Ohio Ct. App. 2005) .....................................29

*Gomez v. Huntington Tr. Co., N.A.*, 129 F. Supp. 2d 1116 (N.D. Ohio
   2000)......................................................................................................43

*Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248 (10th Cir. 2012).......................14

*Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024), ...................... 17, 47

*Hill v. Sonitrol*, 521 N.E.2d 780 (Ohio 1988) .............................................. 27, 35

*Hoffman v. Atlas Title Sols., Ltd.*, 2023 Ohio 1706, 214 N.E.3d 1271
   (Ohio Ct. App. 2023 ............................................................................ 20, 31

*Horizon Images, Inc. v. Delta Color Graphics, Inc.*, 639 So. 2d 186 (Fla. Dist. Ct. App. 1994) ...........................................................................25

*Huff v. FirstEnergy Corp.*, 2011 Ohio 5083, 130 Ohio St. 3d 196, 957 N.E.2d 3 .......................................................................................25

*Hunter v. Shield*, 550 F. Supp. 3d 500 (S.D. Ohio 2021) ....................................20

*Hurley v. Emigrant Bank*, 2019 WL 5537330 (N.D. Tex. Oct. 25, 2019) ...........36

*I Sports v. IMG Worldwide, Inc.*, 2004 Ohio 3113, 157 Ohio App. 3d 593, 813 N.E.2d 4 ................................................................................... 32, 33

*Ikerd Scuba Enter. LLC v. Lakes*, 2014 Ohio 533 (Ohio Ct. App. 2014) .............45

*In re Albion Disposal, Inc.*, 217 B.R. 394 (W.D.N.Y. 1997) ...............................48

*In re Cont'l Broker-Dealer Corp.*, 368 B.R. 109 (Bankr. E.D.N.Y. 2007)...........50

*In re Kaiser Group Intern., Inc.*, 307 B.R. 449 (D. Del. 2004)............................50

*In re Mike Hammer Productions, Inc.*, 294 B.R. 752 (B.A.P. 9th Cir. 2003) ......................................................................................................50

*In re Persky*, 134 B.R. 81 (Bankr. E.D.N.Y. 1991) ..............................................49

*In re Rockwell*, Case No. 20-bk-25326 (Bankr. D. Utah) .....................................12

*In re Standard Jury Instructions—Cont. & Bus. Cases*, 116 So. 3d 284 (Fla. 2013) ........................................................................................25

*In re Stemwedel*, Case No. 11-39196, 2018 Bankr. LEXIS 3083 (Bankr. D. Colo. Sep. 27, 2018) .....................................................................46

*In re The Colad Group, Inc.*, 324 B.R. 208 (Bankr. W.D.N.Y. 2005) ..................50

*Int'l Bhd. of Elec. Workers, Local #111 v. Pub. Serv. Co. of Colo.*, 773 F.3d 1100 (10th Cir. 2014).........................................................................18

*Joseph Bucheck Const. Corp. v. W.E. Music*, 420 So. 2d 410 (Fla. Dist. Ct. App. 1982) ................................................................................43

*Kaplan v. Kimball Hill Homes Fla.*, Inc., 915 So. 2d 755 (Fla. Dist. Ct. App. 2005).........................................................................................35

*Knight v. Altercare Post-Acute Rehab. Ctr., Inc.*, 94 N.E.3d 957 (Ohio Ct. App. 2017).........................................................................................22

*Koechli v. BIP Intern., Inc.*, 870 So. 2d 940 (Fla. Dist. Ct. App. 2004) . 29, 30, 33, 40

*Kolsky v. Jackson Square, LLC*, 28 So. 3d 965 (Fla. Dist. Ct. App. 2010).... 32, 38

*Kratos Invs. LLC v. ABS Healthcare Servs., LLC, 319 So. 3d 97 (Fla. Dist. Ct. App. 2021)*..................................................................................35

*Lash & Goldberg LLP v. Clarke*, 88 So. 3d 426 (Fla. Dist. Ct. App. 2012).........40

*Lynkus Communications v. WebMD Corp.*, 965 So. 2d 1161 (Fla. Dist. Ct. App. 2007).........................................................................................45

*Manning v. Wiscombe*, 498 F.2d 1311 (10th Cir. 1974) ......................................43

*Marcus v. Fla. Bagels, LLC*, 112 So. 3d 631 (Fla. Dist. Ct. App. 2013) .............40

*N.A. Rugby Union LLC v. United States of America Rugby Football Union*, 2019 CO 56, 442 P.3d 859 (Colo. 2019)................................25
*Palm Lake Partners II, LLC v. C & C Powerline, Inc*., 38 So. 3d 844 (Fla. Dist. Ct. App. 2010) ..................................................................44
*Peabody Landscape Constr., Inc. v. Welty Bldg. Co., Ltd.*, 2022 Ohio 3565, 198 N.E.3d 589 (Ohio Ct. App. 2022)......................................35
*Peters v. Columbus Steel Castings Co.*, 2006 Ohio 382........................................22
*Pippin v. Kern-Ward Bldg. Co.*, 8 Ohio App. 3d 196, 456 N.E.2d 1235 (1982)..................................................................................34
*Preston v. Ferrer*, 552 U.S. 346 (2008).................................................................17
*Reeves v. Enter. Prod. Partners, LP*, 17 F.4th 1008, 2021 WL 5183636 (10th Cir. Nov. 9, 2021) ...................................................... 14, 18
*Regions Bank v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 2014 WL 12621478 (N.D. Ga. Oct. 29, 2014) ......................................43
*Riggs v. Patriot Energy Partners, LLC*, 2014 Ohio 558, 2014 WL 605668 (Ohio Ct. App. 2014)......................................................... 32, 38
*Roman v. Atl. Coast Constr. & Dev., Inc.*, 44 So. 3d 222 (Fla. Dist. Ct. App. 2010) .............................................................................. 35, 53
*Stacy David, Inc. v. Consuegra*, 845 So. 2d 303 (Fla. Dist. Ct. App. 2003)...........23
*Stemwedel v. Peak Props. & Dev.* (*In re Stemwedel*), 2019 U.S. Dist. LEXIS 159795 (D. Colo., Sep. 19, 2019) ...........................................46
*Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070 (10th Cir. 2007) ........38
*Strong v. Geringer*, No. 2:15-CV-00837-TC, 2016 WL 4926175, (D. Utah Sept. 15, 2016)...........................................................................50
*United Am. Bank of Cent. Fla., Inc. v. Seligman*, 599 So. 2d 1014 (Fla. Dist. Ct. App. 1992). ................................................................. 20, 31
*United States v. Wood*, 877 F.2d 453 (6th Cir. 1989)............................................44
*USPG Portfolio Six, LLC v. Dick's Sporting Goods, Inc.*, 209 N.E.3d 263 (Ohio 2023) ..............................................................................42
*Waffen v. Summers*, 2009 Ohio 2940 (Ohio. Ct. App. 2009) ...............................20
*Walker v. Builddirect.Com Techs., Inc.*, 733 F.3d 1001 (10th Cir. 2013)............18
*Weiss v. U.S.*, 787 F.2d 518 (10th Cir. 1986) ......................................................38
*West v. Am. Tel. & Tel. Co.*, 311 U.S. 223 (1940)...............................................38
*Williams v. Tony*, 319 So. 3d 653 (Fla. Dist. Ct. App. 2021) ...............................27

**Statutes**

11 U.S.C. § 363..................................................................................................46
26 USC § 1031 .............................................................................................. 8, 40
28 U.S.C. § 1331 ..................................................................................................3
28 U.S.C. § 1367 ..................................................................................................3
9 U.S.C. § 16 ........................................................................................................3

**Treatises**

TREATISE ON THE LAW OF CONTRACTS § 364A (Walter H.E. Jaeger ed., 3d
Ed. 1959)) .......................................................................................................21

## STATEMENT OF PRIOR OR RELATED APPEALS

Pursuant to Tenth Circuit Rule 28.2(C)(3), there are no prior or related appeals.

## INTRODUCTION

This appeal is about whether non-signatories to contracts containing arbitration clauses may enforce those clauses when signatories to the contracts sue the non-signatories on claims arising from the contracts.  Plaintiffs admit that they signed contracts containing arbitration clauses and that those contracts directed First American Title Insurance Company ("First American") to perform services for Plaintiffs, but dispute that First American and its employee, Kirsten Parkin (together the "FA Defendants"), can enforce the contracts' arbitration clauses in a suit that alleges the FA Defendants did not perform the obligations imposed by those contracts.

Plaintiffs are all purchasers in real estate transactions executed pursuant to identical written agreements called a Purchase and Sale Agreement ("PSAs"), each of which contains a mandatory arbitration clause.  The PSAs explicitly name First American as the escrow and closing agent for the transactions, and they contain all the instructions that Plaintiffs allege First American was obligated to follow.  Pursuant to the PSAs, First American (through Parkin) acted as the escrow and closing agent for these transactions.

Plaintiffs brought the underlying lawsuit against the FA Defendants (and others) based on alleged problems with the PSA transactions.  Unsurprisingly, Plaintiffs' claims against the FA Defendants are dependent on the PSAs, because

the PSAs impose the only obligations Plaintiffs allege the FA Defendants were required to carry out.  Plaintiffs' claims are explicitly premised on allegations that the FA Defendants had a duty to ensure that the invested funds were protected for the benefit of the parties and were disbursed according to the PSAs and instructions of the parties, and Plaintiffs' claims against the FA Defendants stem from the FA Defendants' alleged failure to adhere to those PSA-imposed duties.

Plaintiffs cannot assert claims based on the PSAs against the FA Defendants while simultaneously disclaiming their obligations under the PSAs to arbitrate these disputes.  Because the District Court erred in resolving the questions raised by the FA Defendants' motion to compel arbitration, this Court should reverse with directions to grant the FA Defendants' motion to compel arbitration.

## STATEMENT OF JURISDICTION

Plaintiffs asserted claims under the Securities Exchange Act of 1934, the Securities Act of 1933, and state law, asserting subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and over the state law claims pursuant to 28 U.S.C. § 1367.

This Court has appellate jurisdiction pursuant to 9 U.S.C. § 16(a)(1)(C) because the District Court issued an order denying the FA Defendants' motion to

compel arbitration on May 9, 2024.  The FA Defendants timely filed this appeal on May 15, 2024.  *See* FED. R. APP. P. 4(a)(1)(A); 4(a)(4)(A)(iv).

## STATEMENT OF THE ISSUES

1.      Because the PSAs contain broad arbitration clauses that apply to Plaintiffs' claims against the FA Defendants and the PSAs placed First American in a key role in each transaction and created the obligations on which Plaintiffs' claims are based, did the District Court err in denying the FA Defendants' motion to compel arbitration under the PSAs as parties or third-party beneficiaries?

2.      Because Plaintiffs alleged that the FA Defendants acted as agents of the Rockwell defendants, who were signatories to the PSAs, did the District Court err in denying the FA Defendants' motion to compel arbitration under the PSAs as alleged agents of the Rockwell defendants?

3.      Because Plaintiffs based their claims on obligations created by the PSAs and alleged claims against the FA Defendants that were interlinked with Plaintiffs' claims against the Rockwell defendants, did the District Court err in denying the FA Defendants' motion to compel arbitration under the PSAs based on equitable estoppel?

4.      Because the FA Defendants relied on the arbitration clause and their rights to enforce it became vested when they performed their obligations under the PSAs or (at the latest) when they invoked arbitration, and because debtors

cannot waive vested state-law rights of third parties, did the District Court err in

(i) finding that a letter the Rockwell bankruptcy trustee executed after the FA

Defendants moved to compel arbitration waived the FA Defendants' rights to

compel arbitration and (ii) allowing a debtor to unilaterally control and extinguish

non-debtors' rights?

## STATEMENT OF THE CASE

The FA Defendants seek enforcement of Plaintiffs' obligations to arbitrate

their claims under the PSAs, which Plaintiffs entered into when they purchased

Tenant-in-Common ("TIC") interests in real estate developments located in

Florida and Ohio.  Plaintiffs filed their complaint on January 3, 2020 and their

Amended Complaint on August 17, 2021.  *See* App. Vol. I at 22, 57-171.

Plaintiffs allege various claims relating to their respective purchases of TIC

interests in one Florida property or one of three separate Ohio properties pursuant

to PSAs entered into with Rockwell Debt Free Properties or a related Rockwell

entity ("Rockwell").  *See generally id.* at 60 ¶¶ 1-14.  Other than the properties to

which they pertain and the choice of governing law (Florida or Ohio), the PSAs

are substantively identical for each Plaintiff.  *See generally id.* at 216-92; App.

Vol. II at 293-535; App. Vol. III at 536-707 (all PSAs).  Plaintiffs allege that the

FA Defendants "served as escrow agent for each sale of TIC interest," App. Vol. I

at 84 ¶ 129, and "were obligated to handle the escrow account ... consistent with

*the agreement between the parties to the escrow*." *Id.* at 84 ¶ 130 (emphasis added); *id.* at 142 ¶ 408(a) (PSAs constitute the terms of the escrow); *id.* at 143 ¶ 408(c) ("Parkin and First American ... were required to handle the escrow consistent with the express agreements of the parties to the escrow").

Section 9 of each PSA is an arbitration clause. The FA Defendants moved to compel arbitration of the claims asserted against them in the Amended Complaint under the PSAs under these clauses pursuant to Ohio and Florida law. *See id.* at 191-211. The Magistrate Judge (to whom the motion was sent by the District Court) denied the motion to compel, and the FA Defendants timely objected. *See* App. Vol. IV at 946-1009. The District Court overruled the FA Defendants' objections and adopted the Magistrate Judge's Memorandum and Order as described in the District Court's decision, and on that basis denied the FA Defendants' renewed motion to compel. *See id.* at 1011-48. This appeal followed.

## STATEMENT OF FACTS

Plaintiffs are individuals, trustees, and companies that purchased TIC interests in real estate developments located in Florida or one of three located in Ohio, respectively. App. Vol. I at 64 ¶ 14. Plaintiffs purchased their TIC interests from Rockwell through substantively identical PSAs. *Id.* at 130 ¶ 360. In connection with these transactions, First American was required by each PSA

to act as the escrow/closing agent and to add each Plaintiff as an additional insured party to the title insurance policy for the Property at issue. *Id.* at 84 ¶¶ 128-29. Every PSA mentioned First American by name five times, created specific obligations for First American with respect to each Plaintiff's TIC transaction, and created the financial benefits First American would receive with respect to those obligations (such as the payments for adding each Plaintiff to the relevant title policy). *See, e.g.*, *id.* at 218-23 ¶¶ 2.2, 3.2, 3.4, 3.5, 6, 7. The FA Defendants otherwise had no relationship with any Plaintiff, and Plaintiffs' claims against the FA Defendants arise entirely from the PSAs. *See* App. Vol. I at 84 ¶ 130; *see also id.* at 131 ¶ 365 (asserting terms of the PSAs as obligations of the FA Defendants); *id.* at 131 ¶ 367 (same); *id.* at 142-44 ¶¶ 408(a), 408(c), 409, 412(d) (quoting PSAs and alleging tort claims against the FA Defendants for failing to follow the PSAs); *id.* at 148 ¶ 427(a) (aiding and abetting claim premised on First American acting as escrow agent for the TIC transactions); *id.* at 151 ¶ 433(b) (conspiracy claim premised on the FA Defendants disbursing escrow funds "contrary to the terms of the [PSAs]").

## A.    The PSAs

The PSAs name First American as the escrow and closing agent for each TIC transaction and contain the instructions First American was obligated to follow:

- Section 2.2 states that "[t]he balance of the purchase price shall be wired, or otherwise transferred, to First American Title Company within twenty-four hours of closing." *E.g.*, App. Vol. I at 218 § 2.2.

- Section 3.2 requires the Seller to provide periodic statements to "First American Title Company," thereby obligating First American to review periodic statements itemizing various construction costs and to apply escrowed funds to specific purposes based upon that review. *E.g.*, *id.* at 219 § 3.2.

- Section 3.4 creates limitations (predicated on 26 USC § 1031, a part of the Internal Revenue Code) as to when "First American Title Company" should initiate the closing with respect to those TIC transactions Plaintiffs chose to effectuate as "1031 exchanges" for tax purposes. *E.g.*, *id.* at 219 § 3.4.

- Section 6 further provides the conditions for closing that First American was subject to under each PSA. *E.g.*, *id.* at 221 § 6.

These parts of the PSAs were the sole source of First American's escrow and closing obligations to Plaintiffs with respect to their TIC transactions; Plaintiffs affirmatively plead that there were no closing instruction letters or escrow agreements, just the PSAs. *See id.* at 142-44 ¶¶ 408(a), 408(c), 409, 412(d).

Pursuant to and in reliance on the PSAs, First American acted as the escrow and closing agent for each TIC transaction, disbursed escrowed funds collected from Plaintiffs in accordance with the instructions therein, and executed Settlement Statements in connection with each TIC transaction closing. *See id.* at 79-80 ¶ 112; *id.* at 84-85 ¶¶ 128-32.  And consistent with Section 7 of the PSAs, First American was paid for its escrow services by Rockwell. *E.g.*, *id.* at 221 § 7.

The PSAs also required First American to provide title insurance to each Plaintiff in a specific way. *Id.* at 84 ¶¶ 128-29; *Id.* 220 § 4. Prior to Plaintiffs' transactions with Rockwell, First American issued title insurance policies to Rockwell for each Property, with Rockwell as the named insured. *Id.* at 84 ¶ 128. As required by the PSAs (*e.g.*, *id.* at 220 § 4), each Property's title policy was subsequently amended by First American through individual endorsements to add each Plaintiff who purchased an interest in that Property as an "Insured" in an "Amount of Insurance" limited to that Plaintiff's purchase price specified in the PSA. *See* App. Vol. III at 757-76.

Each PSA contains this mandatory arbitration clause:

> **Arbitration.** Any dispute between the parties will be submitted to binding arbitration according to the Commercial Rules of the American Arbitration Association, but need not be filed with that organization. Except for actions relating to the payment of money for services rendered, an action under this Agreement must be filed within 90 days of the closing date. Arbitration will be conducted in [forum state], before a single arbitrator. The parties will be entitled to conduct discovery in accordance with the Federal Rules of Civil Procedure as in effect when arbitration occurs, limited to document production and depositions and subject to further limitation by the arbitrator to secure just and efficient resolution of the dispute. If the amount in controversy exceeds $25,000, the arbitrator's decision will include a statement specifying in reasonable detail the basis for and computation of the award, if any. Judgment upon the award may be entered in any court having jurisdiction.

*E.g.*, App. Vol. I at 221 § 9.

The PSAs for the Ohio Properties are governed by Ohio law, and the PSAs for the Florida Property are governed by Florida law. *E.g*., *id.* at 223 § 18; App. Vol. II at 488 § 18. Each PSA also contains express representations and disclaimers regarding each Plaintiff's individual due diligence and a waiver of claims against Rockwell's agents in connection with each transaction. *E.g.*, App. Vol. I 220-22 §§ 5, 12. The PSAs thus both created obligations for First American and provided benefits to First American.

## B. Plaintiffs' Allegations

Plaintiffs allege that the FA Defendants breached fiduciary duties arising from their obligations under the PSAs and were knowing participants in a scheme with Rockwell and others to sell Plaintiffs TIC Interests in real property projects that were never intended to be built. *See* App. Vol. I at 61-64 ¶¶ 1-13; *id.* at 92 ¶ 427; *id.* at 150-51 ¶ 433(b). Plaintiffs have pled tort claims for breach of fiduciary duty, aiding and abetting, and conspiracy against the FA Defendants that rely on and arise from the PSAs. *See, e.g.*, *id.* at 142-44 ¶¶ 408(a), 408(c), 409, 412(d) (alleging specified terms of the PSAs as basis for fiduciary duty claim); *id.* at 148 ¶ 427(a) (alleging "acting as escrow agent" as basis for aiding and abetting claim); *id.* at 150-51 ¶ 433(b) (alleging disbursing funds from escrow contrary to terms of PSAs as basis for conspiracy claim).

The only "agreement" relating to First American's overall participation in any Plaintiff's TIC transaction is a PSA. *See, e.g.*, *id.* at 144 ¶ 412(d) (alleging that First American's liability stems from "failing to follow the express requirements of the [PSA] ... including specifically, paragraph 3.2"); *see also id.* 142-44 ¶¶ 408(a), 408(c), 409 (alleging First American and Parkin breached duties by failing to comply with escrow terms of the PSAs). Plaintiffs' claims against the FA Defendants are based on and arise from the PSAs.[1]

### C.    The Rockwell Bankruptcy

---

[1] *See also* App. Vol. I at 84 ¶ 127 ("First American and Parkin participated in Rockwell's acquisition of approximately 40 properties and hundreds of sales of TIC interests to investors. Through its long and close relationship with Rockwell and Noah … ."); *id.* at 144 ¶ 409 ("First American and Parkin owed a fiduciary duty to Plaintiffs … according to the agreements and instructions of the parties."); *id.* at 144 ¶ 412 (FA Defendants "breached their fiduciary duty by … Disbursing funds from the escrow at the request of Rockwell, without ensuring that the funds would be used in connection with the intended TIC Property"); *id.* 148 ¶ 427(a) ("First American and Parkin participated and substantially assisted in the tortious conduct by conducting closings, providing title insurance, acting as escrow agent with respect to the TIC Investments, and by disbursing the Plaintiffs' TIC Investments to Rockwell and otherwise carrying out instructions from Rockwell or Noah with respect to the transactions which are the subject of this Complaint."); *id.* at 150 ¶ 433(b) ("Facts manifesting the Defendants' agreement [to participate in a conspiracy] include … First American and Parkin agreed to receive escrow funds in connection with each Construction TIC transaction, but to disburse those funds to Rockwell without Plaintiffs' consent and contrary to the terms of the Purchase Agreements."); *id.* at 163 ¶ 475 ("First American and Parkin also knew or were in possession of sufficient facts that they must have known that Rockwell was not following its own purchase agreement with Plaintiffs or its own Construction TIC program, and that Plaintiffs' 1031 Exchanges were likely invalid.").

On September 2, 2020, Rockwell filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Utah.  *See In re Rockwell*, Case No. 20-bk-25326 (Bankr. D. Utah) (ECF No. 1).  After three trustees resigned, Steven R. Bailey was appointed as trustee (the "Rockwell Trustee") on September 22, 2020.  *See id.* (ECF entry, Sept. 22, 2020).

### D.    The FA Defendants Move to Compel Arbitration

On March 1, 2023, the FA Defendants filed a motion asking the District Court to compel Plaintiffs to arbitrate their claims under the PSAs.[2]  App. Vol. I at 191-211.  Plaintiffs opposed the Motion.  App. Vol. IV at 764-86.  On June 20, 2023, the Magistrate Judge held a hearing on the renewed motion and reserved decision.[3]  App. Vol. I at 52 (ECF No. 243).

On September 21, 2023, the Utah Court of Appeals issued its decision in *First American Title Ins. Co. v. Barron*, 2023 UT App 109, 540 P.3d 623 (2023),

---

[2] The motion was styled as a "Renewed Motion" because the FA Defendants originally moved to compel arbitration on September 16, 2021.  App. Vol. I at 173-190.  The District Court denied the motion without prejudice pending this Court's January 25, 2023 opinion in DiTucci v. First American Title Insurance, No. 21-4120, but did not rule on any substantive arguments.  App. Vol. I at 43 (ECF No. 149).  When the FA Defendants renewed their motion, Plaintiffs again opposed, and this appeal followed the District Court's denial of the renewed motion.  Although the renewed motion also sought to compel arbitration under certain title policies, the FA Defendants are not pursuing those arguments here.

[3] The District Court referred the renewed motion to the Magistrate Judge pursuant to 28 USC § 636(b)(1)(a).  *See* App. Vol. I at 28 (ECF No. 47); *see also* App. Vol. IV at 947 n.5.  At no time did Plaintiffs or the FA Defendants consent to the Magistrate Judge presiding over the case under 28 USC § 636(c).

*cert. denied*, 543 P.3d 1263 (Utah 2024). *Barron* interpreted the same PSA

provisions at issue here in connection with similar claims by the *Barron* plaintiffs,

and held that under Colorado third-party beneficiary law the FA Defendants were

entitled to enforce the PSA arbitration provision against the *Barron* plaintiffs. As

that court explained:

> The PSAs didn't just contemplate the use of an escrow agent; rather, they expressly required the parties to use *First American* for these purposes. Because of this, there was nothing '*incidental*' about the benefit that was conferred by these agreements on First American. Rather, the contracts themselves placed First American in a key role in the transactions. ... We also note that Purchasers 'claims against First American are all linked in some measure to the underlying real estate transactions. Those transactions were governed by the PSAs, Purchasers signed those PSAs, and the PSAs all contained an arbitration clause. ... [W]e hold that First American can invoke the arbitration clause from the PSAs.

*Id.* ¶ 22 (emphasis added); *see also id.* ¶ 26.

On the day the *Barron* opinion was issued, First American filed a Notice of

Supplemental Authority to bring that opinion to the Magistrate Judge's attention.

App. Vol. I at 54 (ECF No. 255). Although the Magistrate Judge and the District

Court acknowledged the existence of *Barron*, neither meaningfully engaged with

its analysis or holding. *See* App. Vol. IV at 971 n.124; *id.* at 1021.

The Magistrate Judge issued an initial "Memorandum and Order" denying

the renewed motion on October 2, 2023. *Id.* at 946-94. The FA Defendants

timely filed an Objection to the Magistrate Judge's Memorandum and Order. *Id.*

at 995-1010.  The District Court entered its "Memorandum Decision and Order" on May 9, 2024, affirming the Magistrate Judge's denial of the renewed motion after purporting to engage in a *de novo* review of the renewed motion.  *Id.* at 1014, 1047.

This appeal followed.

## STANDARD OF REVIEW

An order denying a motion to compel arbitration is reviewed *de novo*.  *See, e.g.*, *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012); *Reeves v. Enter. Prod. Partners, LP*, 17 F.4th 1008, 2021 WL 5183636 at *2 (10th Cir. Nov. 9, 2021).  This Court's *de novo* review must be undertaken "with a healthy regard for the federal policy favoring arbitration."  *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 n.5 (2009) (citation omitted).[4]

## SUMMARY OF ARGUMENT

The FA Defendants moved to compel arbitration under the PSAs based on multiple theories available to them under Florida and Ohio law.  *First*, the FA Defendants were permitted to enforce the PSA arbitration provisions because Plaintiffs' claims are about the transactions governed by the PSAs, Plaintiffs'

---

[4] Although the Magistrate Judge expressed confusion regarding how the District Court should review her order, App. Vol. IV at 947 n.5, the District Court's decision to deem its review *de novo* means that this Court can treat the District Court's order as the denial of the renewed motion that is itself subject to *de novo* review by this Court.

claims are based on alleged violations of the PSAs by the FA Defendants, First American is named in every PSA, and the PSAs create the obligations and benefits at issue in this case.

All this makes the FA Defendants parties to the PSAs for the purposes of enforcing the requirement that disputes relating to the PSAs be arbitrated.  By performing the tasks assigned to them in the PSAs, the FA Defendants became parties entitled to hold Plaintiffs to *Plaintiffs*' promise to arbitrate.  The District Court ignored clear law on this issue, instead focusing solely on who signed the PSAs.

Additionally, as the *Barron* court recognized, the PSAs also clearly made the FA Defendants third-party beneficiaries.  Because Florida, Ohio, and Colorado courts all follow the Restatement (Second) of Contracts test on this issue, analysis of the PSAs under all three states' laws leads to the conclusion that the FA Defendants were third-party beneficiaries, and the District Court erred in not permitting the FA Defendants to enforce the PSAs' arbitration clauses as third-party beneficiaries.

*Second*, Plaintiffs allege that the FA Defendants acted as agents of Rockwell in connection with the transactions governed by the PSAs.  Both Ohio and Florida law permit litigants who are alleged to have acted as agents of a signatory to a contract containing an arbitration clause to compel another

15

signatory who sues them to abide by the arbitration clause in that contract. That is this case. The District Court erred in not permitting the FA Defendants to enforce the PSAs' arbitration clauses as agents of Plaintiffs and/or Rockwell.

*Third*, the FA Defendants are entitled to compel arbitration under Florida and Ohio law based on both states' adoption of equitable estoppel as a basis for non-signatories to compel arbitration. In both Florida and Ohio equitable estoppel apply when either (a) claims against the non-signatory are intertwined with the agreement's underlying obligations or (b) a plaintiff alleges substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract containing the arbitration clause. Both parts of that disjunctive test are met here. Plaintiffs' claims are based directly on the PSAs, and Plaintiffs also allege that the FA Defendants both aided and abetted and conspired with Rockwell and others to deprive Plaintiffs of their funds.

*Fourth*, the District Court erred in concluding that the Rockwell Trustee had, by countersigning a letter from Plaintiffs' counsel after the FA Defendants had performed their obligations under the PSAs and invoked the PSA arbitration clauses, waived the FA Defendants' rights to compel arbitration. This finding is wrong for many reasons, the simplest being that it is inconsistent with Restatement (Second) of Contracts § 311(3) (1981), which precludes signatories to contracts from altering third party beneficiaries' rights after those rights have

16

vested, precisely what Plaintiffs tried to do.  Because that majority view has been

adopted by both Florida and Ohio, the District Court erred in assigning any

weight to the letter signed by the Rockwell Trustee.  Moreover, as the United

States Supreme Court recently made clear in *Harrington v. Purdue Pharma L.P.*,

144 S. Ct. 2071 (2024), the FA Defendants' rights could not be waived in

bankruptcy absent the FA Defendants' consent to such waiver, which never

occurred here.

## ARGUMENT

## I.    FEDERAL LAW FAVORS ARBITRATION AND REQUIRES ANY DOUBTS TO BE RESOLVED IN FAVOR OF ARBITRATION

The Federal Arbitration Act (FAA) "establishes a national policy favoring

arbitration when the parties contract for that mode of dispute resolution," which

applies to all federal and state court proceedings.  *Preston v. Ferrer*, 552 U.S.

346, 349 (2008).  Courts "rigorously enforce arbitration agreements according to

their terms" to further the FAA's strong policy favoring arbitration.  *Am. Express

Co. v. Italian Colors Rest.,* 570 U.S. 228, 233 (2013) (citation omitted).

Generally, the FAA "embodies a strong presumption that an arbitration clause

applies and resolves any doubt arising from the contract language to favor

arbitration."  *Citizen Potawatomi Nation v. Oklahoma*, 881 F.3d 1226, 1231 n.7

(10th Cir. 2018).  "If the arbitration clause is broad, the presumption in favor of

arbitrability is strong and 'only the most forceful evidence of a purpose to exclude

the claim from arbitration can prevail.'" *Int'l Bhd. of Elec. Workers, Local #111 v. Pub. Serv. Co. of Colo.*, 773 F.3d 1100, 1110 (10th Cir. 2014) (citation omitted).[5]

Determining whether parties have agreed to arbitrate a dispute requires applying "ordinary state-law principles that govern the formation of contracts." *Walker v. Builddirect.Com Techs., Inc.*, 733 F.3d 1001, 1004 (10th Cir. 2013) (citation omitted).  State law also determines when a non-signatory can compel arbitration.  *See Reeves v. Enter. Prod. Partners, LP*, 17 F.4th 1008, 1011-12 (10th Cir. 2021).  Ohio and Florida law thus apply in addressing the arbitrability questions presented here.  *See, e.g.*, App. Vol. I at 223 6 ¶ 18; App. Vol. II at 411 6 ¶ 18.

## II.    THE DISTRICT COURT ERRED IN NOT COMPELLING ARBITRATION UNDER THE PSAS.[6]

---

[5] Although the District Court recognized that any doubts concerning whether claims are arbitrable should be resolved in favor of arbitration, App. Vol. IV at 1015, it erred in applying that requirement.  Those errors require reversal.

[6] For good reason, Plaintiffs have not argued that there is any reason to distinguish between First American's or Parkin's ability to compel arbitration.  Parkin is named as a defendant solely based upon alleged conduct she engaged in as First American's employee.  Where a principal may invoke an arbitration clause, so may its employees.  *See Hicks v. Cadle Co.*, 355 F. App'x 186, 193 (10th Cir. 2009); *Qubty v. Nagda*, 817 So. 2d 952, 958 (Fla. Dist. Ct. App. 2002); *Manos v. Vizar*, No. 96 CA 2581-M, 1997 WL 416402, at *1 (Ohio Ct. App. July 9, 1997).

The FA Defendants moved to compel arbitration under the PSAs as parties to the PSAs, as third-party beneficiaries of the PSAs, as alleged agents of Rockwell, and on the basis of equitable estoppel.  Each of these bases for enforcement of an arbitration clause by a non-signatory against a signatory is available under both Florida and Ohio law, and the FA Defendants demonstrated that they satisfied all four bases to compel arbitration under the PSAs.[7]

As demonstrated below, the District Court erred in ruling on each of the FA Defendants' arguments to compel arbitration, thus requiring reversal.

**A.    The FA Defendants Are Entitled to Compel Arbitration as Parties to or Third-Party Beneficiaries of the PSAs**

**1.    The FA Defendants are Parties to the PSAs and are Entitled to Compel Arbitration on that Basis**

"An escrow or closing agent owes a contractual duty to each party to the escrow agreement."  2 Title Ins. Law § 20:3 (2022 ed.).  The PSAs set forth the sole terms of the escrows at issue in Plaintiffs' claims.  By agreeing to render the services set forth in the PSAs (services First American was explicitly designated to perform), the FA Defendants became parties to the PSAs.  *See Hoffman v. Atlas Title Sols., Ltd.*, 2023 Ohio 1706 ¶¶ 34-39, 214 N.E.3d 1271, 1279-80

---

[7] If this Court believes there is any doubt regarding how Florida or Ohio law would apply to this case, it may exercise its discretion to certify questions to the Supreme Courts of one or both States.  *See* 10th Cir. R. 27.4(A) & (B); Ohio S. Ct. Prac. R. 9.01; Fla. R. App. P. 9.150.

(Ohio Ct. App. 2023); *Waffen v. Summers*, 2009 Ohio 2940 ¶¶ 35-36 (Ohio. Ct.

App. 2009); *Armbruster v. Alvin*, 437 So. 2d 725, 727 (Fla. Dist. Ct. App. 1983);

*see generally United Am. Bank of Cent. Fla., Inc. v. Seligman*, 599 So. 2d 1014,

1016 (Fla. Dist. Ct. App. 1992).

The District Court's contrary conclusion was predicated on the fact that

"the only signers" were Rockwell and Plaintiffs, which the District Court

interpreted to mean "there was [no] meeting of the minds between the three

groups of individuals and entities that the FA Defendants agreed to arbitrate."

App. Vol. IV at 1019.  This conclusion elevated form over substance:  By

focusing only on the signers, the District Court ignored the FA Defendants'

acceptance and performance of the specific and exclusive duties the PSAs

expressly required First American to perform as escrow and closing agent; and

Rockwell's and Plaintiffs' acceptance and use of the FA Defendants as escrow

and closing agent.  The District Court's holding thus contravenes Ohio and

Florida law that a non-signatory is deemed a party to a contract if the non-

signatory assents to its obligations under the contract.  *See Conseal Int'l Inc. v.

Neogen Corp.*, 488 F. Supp. 3d 1257, 1269-70 (S.D. Fla. 2020); *Hunter v. Shield*,

550 F. Supp. 3d 500, 519 n.6 (S.D. Ohio 2021)  This is exactly what occurred

here.

20

Plaintiffs' own allegations further support that the FA Defendants were parties to the PSAs.  Plaintiffs repeatedly allege that the FA Defendants breached obligations set forth and specified only in the PSAs.  *See, e.g.*, App. Vol. I at 84 ¶ 130 (alleging the FA Defendants "were obligated to handle the escrow accounts ... consistent with the agreements between the parties to the escrow"); *id.* at 130 ¶ 363 (same); *id.* at 131 ¶ 365 (reciting terms of the PSAs as basis for obligations of the FA Defendants); *id.* at 131 ¶ 367 (same); *id.* at 142-43 ¶¶ 408(a), 408(c), 409, 412(d) (quoting PSAs as basis to allege First American liable for breaching those obligations); *id.* at 148 ¶ 427(a) (alleging aiding and abetting claim based on PSA obligations); *id.* at 151 ¶ 433(b) (alleging conspiracy claim based on PSA obligations).  Plaintiffs cannot have it both ways.  There is no legal basis under which the FA Defendants could be bound to follow the terms of the PSAs and face potential liability for not doing so, as Plaintiffs allege, without the FA Defendants also being parties to the PSAs.  *Accord Borsack v. Chalk & Vermilion Fine Arts, Ltd.*, 974 F. Supp. 293, 302 (S.D.N.Y. 1997) (rejecting plaintiff's argument that non-signatory could not enforce arbitration clause because it was not a "party" and noting that the principle of allowing such application extends back at least as far as Samuel Williston, A TREATISE ON THE LAW OF CONTRACTS § 364A (Walter H.E. Jaeger ed., 3d Ed. 1959)).  The District Court erred by failing to correctly apply Ohio and Florida law.

**2.      The FA Defendants Satisfy The Requirements to Compel Arbitration As Third- Party Beneficiaries of the PSAs**

The FA Defendants are also entitled to compel arbitration as third-party beneficiaries of the PSAs.  Ohio and Florida courts permit non-signatories to enforce arbitration agreements in contracts against signatories to those contracts when the non-signatory can be considered a third-party beneficiary of the contract.  *See Knight v. Altercare Post-Acute Rehab. Ctr., Inc.*, 94 N.E.3d 957, 962 (Ohio Ct. App. 2017); *Peters v. Columbus Steel Castings Co.*, 2006 Ohio 382, ¶ 13, *Columbus Steel Castings Co.*, 2006 Ohio 382, ¶ 13, *aff'd*, 2007 Ohio 4787, 873 N.E.2d 1258; *Fla. Power & Light Co. v. Rd. Rock, Inc.*, 920 So. 2d 201, 203 (Fla. Dist. Ct. App. 2006).

The FA Defendants are third-party beneficiaries of the PSAs because "[t]he PSAs didn't just contemplate the use of an escrow agent; rather, they expressly required the parties to use First American for these purposes."  *Barron*, 2023 UT App 109, ¶ 22; *accord Chitlik v. Allstate Ins. Co.*, 34 Ohio App. 2d 193, 196, 299 N.E.2d 295, 297 (Ohio Ct. App. 1973) ("The third party need not be named in the contract, as long as he is contemplated by the parties to the contract and sufficiently identified.").  In addition to specifying First American as the escrow agent, closing agent, and provider of title insurance to Plaintiffs, the PSAs:

- Set forth the FA Defendants' obligations and benefits;
- Outline the FA Defendants' escrow instructions;

22

- Specify that First American is to be paid for its services; and

- Are the only documents setting forth those instructions and obligations.

*See, e.g.*, App. Vol. I at 218-21 §§ 2.2, 3.2, 3.4, 3.5, 6, 7.

Plaintiffs and Rockwell intended to benefit First American by executing the PSAs and by then paying First American for its services undertaken pursuant to the PSAs. And, as the *Barron* court correctly decided, "there was nothing 'incidental' about the benefit that was conferred by these agreements on First American. Rather, the contracts themselves placed First American in a key role in the transactions." *Barron*, 2023 UT App 109, ¶ 22. The District Court erred by not recognizing that these intended benefits arose from duties owed to the FA Defendants under the PSAs.

Plaintiffs' claims also all arise from the PSAs. The PSAs dictate First American's escrow duties and, although Plaintiffs style their claims as tort claims,[8] they are all dependent on allegations that the FA Defendants breached their obligations under the PSAs. As *pled by the Plaintiffs*, the FA Defendants allegedly "fail[ed] to follow the express requirements of the [PSA] ... including specifically, paragraph 3.2." App. Vol. I at 144 ¶ 412(d); *compare Barron*, 2023

---

[8] Whether Plaintiffs' claims sound in tort or contract is irrelevant because the PSAs require "any" claim to be arbitrated, *e.g.*, App. Vol. 1 221 § 9, and Florida and Ohio courts hold such arbitration clauses include both tort and contract claims, *see Duff v. Christopher*, 231 N.E.3d 1173 (Ohio Ct. App. 2023); *Stacy David, Inc. v. Consuegra*, 845 So. 2d 303, 306 (Fla. Dist. Ct. App. 2003).

UT App 109, ¶ 28 ("Purchasers' claims against First American are all linked in some measure to the underlying real estate transactions.  Those transactions were governed by the PSAs, Purchasers signed those PSAs, and the PSAs all contained an arbitration clause. ...  [A] contrary ruling would improperly give the plaintiff an 'end-run around' a provision from a contract to which the plaintiff was a party.").

Applying Colorado law to substantively identical claims by the *Barron* plaintiffs, the Utah Court of Appeals correctly analyzed identical PSAs in *Barron* and compelled arbitration under the PSAs under Colorado's third-party beneficiary test.  *See Barron*, 2023 UT App 109 ¶¶ 22, 26.  The District Court should have followed *Barron*, but did not.

The District Court first held that *Barron* has "little bearing here" because it applied Colorado law.  App. Vol. IV at 1021.  But as the FA Defendants demonstrated, Colorado, Florida, and Ohio law are nearly identical in allowing the FA Defendants to apply the PSA arbitration clauses as third-party beneficiaries, and thus the District Court's failure to follow *Barron*'s reasoning was wrong.

All three jurisdictions derive their tests from the Restatement (Second) of Contracts § 302 (1981), which sets forth the prevailing definition of "intended beneficiary" with respect to third-party beneficiary status.  Because Colorado

follows Restatement § 302, *E.B. Roberts Const. Co. v. Concrete Contractors, Inc.*, 704 P.2d 859, 865 n.7 (Colo. 1985), when *Barron* applied Colorado law it was applying Restatement § 302.  *Compare Barron*, 2023 UT App 109, ¶ 21 *with N.A. Rugby Union LLC v. United States of America Rugby Football Union*, 2019 CO 56, ¶ 34, 442 P.3d 859 (Colo. 2019) *and E.B. Roberts*, 704 P.2d at 865 n.7.

Florida and Ohio have also expressly adopted Restatement § 302.  *See Huff v. FirstEnergy Corp.*, 2011 Ohio 5083, ¶¶ 10-11, 130 Ohio St. 3d 196, 200, 957 N.E.2d 3, 6-7 (because Ohio "adopted" Restatement § 302, "if the promisee ... intends that a third party should benefit from the contract, then that third party is an 'intended beneficiary' who has enforceable rights under the contract") (citation omitted); *Horizon Images, Inc. v. Delta Color Graphics, Inc.*, 639 So. 2d 186, 187 (Fla. Dist. Ct. App. 1994) ("In order for a third party to maintain a breach of contract, the parties must have clearly intended that the contract directly and substantially benefit the third party" (citing Restatement § 302)); *In re Standard Jury Instructions—Cont. & Bus. Cases*, 116 So. 3d 284, 304 (Fla. 2013) (explaining that *all* intermediate appellate courts in Florida have relied upon Restatement § 302).  Because *Barron* was based on Restatement § 302 and the same rule applies in Florida and Ohio, the District Court erred in not following *Barron*.

The District Court also misapplied Florida and Ohio law when it held that "[t]he PSA only references First American four times."  App. Vol. IV at 1023.  That is both wrong and irrelevant.  Although the PSAs actually reference First American five times by name, no case cited by the District Court holds that determining third-party beneficiary status is an exercise in counting the number of times a name appears in a contract or that a third-party beneficiary's name need appear at all.  That is not surprising, given that both Restatement § 302 and the District Court's own formulation state that one looks at "the terms of the contract at issue" to determine third-party beneficiary status, rather than applying simple math.  Restatement § 302; App. Vol. IV at 1023.  The PSAs clearly establish what *Barron* held—that First American was an integral part of each TIC transaction, with specific obligations regarding the handling of funds for and closing of each transaction and the right to receive payment for those services and for adding each Plaintiff as a named insured.  If an entity who is assigned specific rights and duties in a contract *by name* is not a third-party beneficiary of that contract, it is difficult to imagine who would be considered a third-party beneficiary.  This is especially true when the signatory to the contract sues a non-signatory based on the specific terms of the contract that identify the non-signatory and assign it rights and obligations.

The District Court also relied on cases that do not support its holding. *Williams v. Tony*, 319 So. 3d 653, 657 (Fla. Dist. Ct. App. 2021), for example, involved (a) a contract containing a no-third-party beneficiaries clause and (b) a non-party nevertheless trying to *bring* an action under that contract. But the PSAs contain no such limiting clause, and the FA Defendants—who Plaintiffs have sued for, *inter alia*, allegedly breaching obligations imposed on them by the PSAs—are not trying to sue under the PSAs, they are invoking a provision of the PSAs against Plaintiffs who based *their* claims on the PSAs (the opposite of *Williams*). And although *Caruso v. Nat'l City Mtg. Co.*, 931 N.E.2d 1167, 1171-72 (Ohio Ct. App., 1st Dist. 2010), stated that "[a]n incidental or indirect benefit to the third party is not sufficient to *provide the third party with a cause of action*" (emphasis added), that case was similar to *Williams* in that a plaintiff was trying to invoke a contract to which it was not a party to *bring* an action.[9] The cases relied on by the District Court involved non-signatories seeking to impose

---

[9] *Hill v. Sonitrol*, 521 N.E.2d 780, 784-85 (Ohio 1988), also involved a non-signatory trying to assert a claim against a signatory. But in that case, there was even more evidence that the plaintiff was not an intended third-party beneficiary: Not only was the plaintiff not named in the contract (unlike First American), the contract was constructed for the specific protection of the premises at issue *while employees like the plaintiff were not present*. *See id*. The plaintiff thus could not have been an intended beneficiary of the contract under which she tried to sue. As *Barron* recognized, a contract that specifically names and directly assigns rights and obligations to First American is not like the contracts in the cases the District Court relied on. *See Barron*, 2023 UT App 109, ¶ 26.

obligations through contract claims, whereas this case and *Barron* involve signatories to a contract asserting claims based on that contract against a non-signatory who the contract placed in a "key role" in the transaction, and the non-signatory *defending against* those claims by seeking to enforce the arbitration provision in the same contract.[10]  Therefore, the FA Defendants can compel arbitration as third-party beneficiaries.

### 3.    The FA Defendants Did Not Waive The Third-Party Beneficiary Argument

The District Court erred in ruling that the FA Defendants waived the third-party beneficiary argument because, in the District Court's view, Plaintiffs first raised the third-party beneficiary issue in opposing the FA Defendants' motion and the FA Defendants did not respond.  App. Vol. IV at 1021-22.  That is wrong: The FA Defendants made the third-party beneficiary argument in their opening brief with citations to Florida and Ohio law.  App. Vol. I at 204 ("The FA Defendants may also compel arbitration under the PSAs as third-party beneficiaries of the agreements.  Ohio and Florida law recognize that non-signatories may enforce arbitration agreements in contracts if the contract expresses an intent to benefit." (citing cases)).  The FA Defendants also addressed the argument in their reply brief:  Part of the response to Plaintiffs' argument that

---

[10] The District Court understood that a signatory trying to bind a non-signatory to an arbitration agreement presents different issues.  *See* App. Vol. IV at 1034.

the Rockwell Trustee had waived the PSA arbitration provision (which was necessarily a defense to compelling arbitration) was that "[s]ignatories to an agreement cannot waive a *third party's rights* after those rights have accrued," App. Vol. IV at 885 (emphasis added) (citing authorities), disproving the District Court's view of the record.  The District Court's decision in this regard, thus, has no support in the record.

### B.     The FA Defendants Are Entitled to Compel Arbitration As Alleged Agents of Rockwell

Ohio and Florida law permit the FA Defendants to compel Plaintiffs to arbitrate because Plaintiffs allege an agency relationship between the FA Defendants and Rockwell.  *Genaw v. Lieb*, 2005 WL 435211 at *4 (Ohio Ct. App. 2005) ("[A] nonsignatory agent may enforce an arbitration agreement between a plaintiff and the agent's principal when ... the alleged misconduct arose out of the agency relationship."); *Koechli v. BIP Intern., Inc.*, 870 So. 2d 940, 944 (Fla. Dist. Ct. App. 2004) (nonsignatory can compel arbitration (a) when the signatory "rel[ies] on the terms of the written agreement in asserting its claims against the nonsignatory" or (b) when the signatory raises allegations of "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract").

Plaintiffs specifically alleged that (a) the FA Defendants had an agency relationship with Rockwell[11] and (b) the terms of the PSAs give rise to their claims against the FA Defendants.[12]  They further allege that the conduct of Rockwell and the FA Defendants is substantially interdependent and arises from the agency relationship.[13]  Accordingly, the FA Defendants are entitled to compel arbitration of Plaintiffs' claims based on these allegations.  *See, e.g.*, *Koechli*, 870

---

[11] *E.g.*, App. Vol. I at 84 ¶ 127 ("Rockwell selected and used First American and its agent, Parkin, to close the purchase and sale of TIC interests in Noah TIC Properties"); *id.* ¶ 129 ("First American and Parkin also served as escrow agent for each sale of TIC interest"); *id.* at 130 ¶ 361 ("By Rockwell's choosing First American acted as the title insurer, closing agent, and escrow agent in connection with all of Plaintiffs' TIC Investments").

[12] *E.g.*, App. Vol. I at 131 ¶ 365 (reciting terms of the PSAs as basis for obligations of the FA Defendants); *id.* ¶ 367 (same); 142-43 ¶¶ 408(a), 408(c), 409, 412(d) (quoting PSAs as basis to allege First American liable for breaching those obligations); 148 ¶ 427(a) (alleging "First American and Parkin participated and substantially assisted in the tortious conduct by ... acting as escrow agent with respect to the TIC investments"); *id.* at 151 ¶ 433(b) (alleging conspiracy on basis that "First American and Parkin agreed to receive escrow funds" and disbursed those funds "contrary to the terms of the [PSAs]").

[13] *E.g.*, App. Vol. I at 64 ¶ 13 (alleging that "First American Title Insurance Company and its agent, Kirsten Parkin, ... enabled Rockwell and Noah to take and squander Plaintiffs' investments without completing construction"); *id.* at 84-85 ¶¶ 127, 131 (reciting bases for FA Defendants' alleged knowing participation in Rockwell's scheme); 131-32 ¶ 367-69 (same); 144 ¶ 412(c) (alleging FA Defendants wrongfully "[d]isburs[ed] funds from the escrow at the request of Rockwell"); *id.* at 148 ¶ 427(b) (alleging FA Defendants aided and abetted knowing "Rockwell was not following the rules applicable to 1031 Exchanges"); 151 ¶ 433(b) (alleging FA Defendants conspired with Rockwell to "conceal from Plaintiffs the failure of [Rockwell, and others] to carry out the Construction TIC program consistent with its design and applicable rules").

So. 2d at 944 (agent of signatory was a "party" to the agreement despite not being a third-party beneficiary).

The District Court tried to side-step this argument by ignoring Plaintiffs' allegations and instead focusing on whether or not the FA Defendants were in fact "common-law agents" subject to Rockwell's control. *See* App. Vol. IV at 1024-25. That was error.

*First*, even if focusing on this issue were permitted, the District Court's conclusion was wrong because both Florida and Ohio consider escrow agents "common law" agents of all parties to escrow agreements (here the PSAs). *See Hoffman v. Atlas Title Sols., Ltd.*, 214 N.E.3d 1271, 1280 (Ohio Ct. App. 2023); *United Am. Bank of Cent. Fla., Inc. v. Seligman*, 599 So. 2d 1014, 1016 (Fla. Dist. Ct. App. 1992) ("The relationship established is that of principal and agent and involves the escrow agent being an agent of, and owing a fiduciary duty to, all of the principal parties.").

*Second*, the FA Defendants were not required to prove that they were common-law agents under the Florida and Ohio cases discussed above, and the District Court's discussion of the factors for proving common-law agency, App. Vol. IV at 1024, is therefore irrelevant.

*Third*, the FA Defendants did satisfy the "control" requirements the District Court claimed were absent when it incorrectly held that "the PSAs do not provide

31

for either party [Rockwell and Plaintiffs] having the right to control the FA Defendants." *Id.* at 1024-25. The FA Defendants correctly pointed to the provisions of the PSA that, on behalf of both Plaintiffs and Rockwell, imposed obligations on the FA Defendants to act in conformance therewith (as Plaintiffs themselves alleged in the Amended Complaint).

*Fourth*, by ignoring Plaintiffs' allegations and opining on whether or not the FA Defendants were or were not "common-law" agents, the District Court improperly construed doubts against a finding of arbitrability, when it should have resolved those doubts in favor of arbitration.

## C.    The FA Defendants Are Entitled to Compel Arbitration Under the PSAs Pursuant to Equitable Estoppel

Both Florida and Ohio have allowed non-signatories to a contract to compel arbitration based on equitable estoppel under circumstances similar to those presented here. *Riggs v. Patriot Energy Partners, LLC*, 2014 Ohio 558, ¶¶ 41-43, 2014 WL 605668, *8 (Ohio Ct. App. 2014); *Kolsky v. Jackson Square, LLC*, 28 So. 3d 965, 969 (Fla. Dist. Ct. App. 2010). In both states, the application of the doctrine of equitable estoppel applies in at least two alternative scenarios. In this case, both of these scenarios are satisfied. *First*, equitable estoppel applies "where a signatory must rely on the terms of the written agreement in asserting claims against a nonsignatory." *I Sports v. IMG Worldwide, Inc.*, 2004 Ohio 3113, ¶ 16, 157 Ohio App. 3d 593, 599, 813 N.E.2d 4; *AP Atl., Inc. v. Silver*

32

*Creek St. Augustine, LLP*, 266 So. 3d 865, 866 (Fla. Dist. Ct. App. 2019). *Second*, equitable estoppel also applies "where the signatory alleges substantially interdependent and concerted misconduct by both the nonsignatory and one or more signatories to the contract." *I Sports*, 813 N.E.2d at 8; *Koechli v. BIP Int'l, Inc.*, 870 So. 2d 940, 944 (Fla. Dist. Ct. App. 2004). The District Court erred in not recognizing that both scenarios are satisfied in this case.

### 1.    The FA Defendants are Entitled to Compel Arbitration Because, as the District Court Acknowledged, Plaintiffs' Claims are Premised on the Terms of the PSAs.

Plaintiffs' claims against the FA Defendants are firmly rooted in the terms of the PSAs. As noted above, Plaintiffs do not simply rely on the PSAs, but pointedly allege that the FA Defendants' liability stems from the FA Defendants' failure to abide by all of the specific obligations undertaken by the FA Defendants as escrow officers under the PSAs. For example, Plaintiffs' breach of fiduciary duty claim alleges that there were no "escrow instructions" other than the PSAs, App. Vol. I at 142 ¶ 408; *see also id.* at 130 ¶¶ 362-63, and that it was the FA Defendants' failure "to follow the express requirements of the [PSAs], including, specifically, paragraph 3.2" that caused Plaintiffs' alleged damages. Likewise, Plaintiffs allege that the FA Defendants aided and abetted Rockwell by "acting as escrow agent" under the PSAs, App. Vol. I at 148 ¶ 427(a), and conspired with Rockwell by disbursing funds from the escrow "contrary to the terms of the

[PSAs]," *id.* at 150-151 ¶ 433(b)).  Plaintiffs' claims thus expressly rely on the

PSAs, which is unsurprising, given that "[a]n escrow agent's duties are fixed and

limited by the escrow agreement."  *Pippin v. Kern-Ward Bldg. Co.*, 8 Ohio App.

3d 196, 199, 456 N.E.2d 1235, 1238 (1982); *see also Cradock v. Cooper*, 123 So.

2d 256, 257 (Fla. Dist. Ct. App. 1960) ("[T]he escrow agreement itself becomes

the primary consideration and the language of this agreement is all controlling.").

Indeed, the District Court acknowledged that Plaintiffs' claims rely on the

FA Defendants' supposed failure to follow the "express requirements" of the

PSAs,[14] but then concluded that because Plaintiffs assert tort claims instead of

contract claims, they are not covered by the PSA arbitration clauses.  *See* App.

Vol. IV at 1030.  This is precisely the type of distinction that the case law does

not permit.  "A party cannot avoid arbitration by casting contract claims as torts."

*Javorsky v. Javorsky*, 81 N.E.3d 971, 974 (Ohio Ct. App. 2017); *cf. Armas v.*

*Prudential Sec., Inc.*, 842 So. 2d 210, 212 (Fla. Dist. Ct. App. 2003) (equitable

---

[14] The District Court's analysis of the 1031 Exchange-related issues, App. Vol. IV
at 1031, is wrong because it misapprehends what the statute imposes and what the
PSAs impose.  Although Section 1031 of the Internal Revenue Code creates the
structure for 1031 exchanges in general, it assigns no duties to the FA Defendants
(or anyone else).  The only things that assign 1031 exchange-related duties to the
FA Defendants are the PSAs.  This is why the District Court's reliance on
*Javorsky*, is misplaced:  *Javorsky* supports the FA Defendants' motion because
Plaintiffs' claims depend on the assignment of 1031 exchange-related obligations
to the FA Defendants by the PSAs.

estoppel applies where "the signatory's claims against a non-signatory make reference to or presume the existence of a written agreement"). Both Ohio and Florida courts have made clear that tort claims based on contractual duties fall within the scope of an agreement to arbitrate disputes relating to a contract. *Kaplan v. Kimball Hill Homes Fla.*, Inc., 915 So. 2d 755, 759 (Fla. Dist. Ct. App. 2005); *Duff v. Christopher*, 2023 Ohio 4873, ¶ 25, 233 N.E.3d 109 (Ohio Ct. App. 2023), 116, *appeal not allowed*, 2024 Ohio 1386, ¶ 25, 231 N.E.3d 1173 (Ohio 2024).

Plaintiffs' claims are based on the PSAs, and that is all Ohio and Florida law require. *See generally Peabody Landscape*, 198 N.E.3d 589, 598 (Ohio Ct. App. 2022) ("[A]rbitration may be compelled due to … the fact that claims were intimately founded in and intertwined with the underlying obligations"); *AP Atl., Inc.*, 266 So. 3d at 866 (same); *Kratos Investments*, 319 So. 3d 97, 101 (Fla. Dist. Ct. App. 2021) (same); *Roman v. Atl. Coast Constr. & Dev., Inc.*, 44 So. 3d 222, 224 (Fla. Dist. Ct. App. 2010) (compelling the signatory plaintiff to arbitration for his claims against for civil theft and statutory violations for alleged misuse of escrow funds); *Armas v. Prudential Sec., Inc.*, 842 So. 2d 210, 212 (Fla. Dist. Ct. App. 2003) (compelling arbitration with nonsignatory under equitable estoppel).

Not only did the District Court's holding contravene Ohio and Florida law on equitable estoppel, it also ran afoul of the FAA. "[B]oth federal and state

courts are generally hostile towards attempts to artfully plead around arbitration"

in enforcing the FAA and should "engage[] in an analysis to scrutinize causes of

action carefully to search out artfully pleaded claims that attempt to avoid the

arbitration clause to which the plaintiffs have agreed." *See Hurley v. Emigrant*

*Bank*, 2019 WL 5537330, at *7, n. 7 (N.D. Tex. Oct. 25, 2019) (collecting cases);

*see also Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v.*

*MedPartners, Inc.,* 203 F.R.D. 677, 686 (S.D. Fla. 2001), *aff'd in part, appeal*

*dismissed in part*, 312 F.3d 1349 (11th Cir. 2002) (parties should not be permitted

to "avoid arbitration simply through artful pleading").

> ## 2. The FA Defendants are Entitled to Compel Arbitration Because Plaintiffs Allege Concerted Misconduct Between the FA Defendants and Rockwell.

The FA Defendants are also entitled to compel arbitration under the

"concerted misconduct" variant of equitable estoppel.  Plaintiffs repeatedly allege

that the FA Defendants engaged in or otherwise assisted Rockwell's alleged

misconduct.  *See*, *e.g.*, *supra* n.1. Eliminating any possible doubts that Plaintiffs

allege concerted misconduct are Plaintiffs' claims against the FA Defendants for

aiding and abetting (Count Six) and conspiracy (Count Seven).  In those claims,

Plaintiffs allege that, by virtue of their participation in the escrow, the FA

Defendants aided and abetted Rockwell's misconduct and conspired with

Rockwell to misuse Plaintiffs' funds.  In other words, Plaintiffs allege and bring

claims on the basis that the FA Defendants were knowing participants in a scheme with Rockwell and others to sell Plaintiffs TIC Interests in real property projects that were never intended to be built.

The District Court agreed, noting with approval that "the magistrate judge herself acknowledged that 'Plaintiffs do raise allegations of *concerted misconduct* between the Rockwell parties and FA Defendants.'"  App. Vol. IV at 1032 (emphasis added).  But the District Court then wrongly refused to apply the concerted misconduct formulation of equitable estoppel.  *Id.* at 1033-1035.  It reasoned that, although Ohio's and Florida's intermediate appellate courts repeatedly applied the doctrine, neither state's Supreme Court had issued opinions expressly adopting the doctrine.  *Id.*  Specifically, the District Court expressed reticence to "expand state law without guidance from its highest court."  *Id.* at 1033.

That was erroneous.  Contrary to the District Court's suggestion, the FA Defendants were not asking the District Court to "expand" state law.  Instead, the FA Defendants were asking the District Court to *follow* and apply well-established law repeatedly applied by Ohio's and Florida's intermediate appellate courts.  This Court's rule is that a prediction as to how a state's highest court would rule is only required "[w]here no state court has addressed clearly the substantive law" at issue; otherwise, "federal courts must follow intermediate

37

state court decisions, policies underlying the applicable legal principles, and the doctrinal trends indicated by these policies." *Weiss v. U.S.*, 787 F.2d 518, 525 (10th Cir. 1986). And intermediate state appellate court decisions are not to be disregarded unless a federal court is convinced by other persuasive data that the state's highest court would decide the issue differently. *See Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007); *see also West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940). Neither the District Court nor Plaintiffs cited any authority to suggest that Florida's or Ohio's Supreme Courts would disregard the concerted misconduct doctrine that its intermediate appellate courts have continuously applied, and which both states have clearly adopted.

The District Court also suggested that the intermediate appellate court opinions applying the estoppel doctrine may be invalid in light of the 2009 Carlisle decision. *See* App. Vol. IV at 1033 n.148. But this is clearly wrong: The FA Defendants relied on cases such as *Riggs v. Patriot Energy Partners, LLC*, 2014 Ohio 558 (Ohio Ct. App. 2014) and *Kolsky v. Jackson Square*, 28 So. 3d 965 (Fla. Dist. Ct. App. 2010), both of which applied estoppel and were decided after *Carlisle*. *Carlisle* could not have overruled, diminished, or otherwise negatively affected those decisions. The District Court also relied on *GE Energy Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637 (2020), for the proposition that state court arbitration decisions

38

that rely on federal court decisions are somehow potentially invalid.  App. Vol.
IV at 1035 n.160.  But *GE Energy* did not change any relevant law, and in fact
reaffirmed the ability of non-signatories to enforce arbitration agreements
(indeed, it cited *Carlisle* for that, which renders the District Court's failure to
apply post-*Carlisle* decisions even stranger).  Neither Plaintiffs nor the District
Court cited any post-*GE Energy* decisions that are inconsistent with the FA
Defendants' estoppel arguments.

Finally, the District Court erroneously concluded that the concerted
misconduct theory could not be applied in light of the fact that the "Rockwell
Defendants waived their right to arbitration during bankruptcy court
proceedings."  App. Vol. IV at 1037.  This was so, according to the District
Court, "[b]ecause the doctrine is rooted in ensuring that the arbitration between
the signatories is not rendered meaningless."  *See id.* (citing *Ben-Yishay v.
Mastercraft Dev., LLC*, No. 08-14046-CIV, 2009 WL 6387928, at
*6 (S.D. Fla. Dec. 14, 2009).  The District Court did not cite any Florida law, nor
did *Ben- Yishay*.  It appears that the District Court was concerned that the
doctrine's purpose is to prevent bifurcation of functionally the same claims
between arbitration and litigation.  Although preventing inappropriate claim
bifurcation may present a reason to not apply equitable estoppel under certain
circumstances, there is no authority where any Florida or Ohio court has held that

this policy precludes the application of the "concerted misconduct" doctrine.  On the contrary, Florida and Ohio Courts analyze whether the allegations meet the "concerted misconduct" test—which the District Court tacitly conceded had been satisfied—and if so, they compel arbitration.  *See*, *e.g.*, *Discovery Res., Inc. v. Ernst & Young U.S. LLP*, 2016 Ohio 1283, ¶ 23, 62 N.E.3d 714, 721 (Ohio Ct. App. 2016); *Lash & Goldberg LLP v. Clarke*, 88 So. 3d 426, 428 (Fla. Dist. Ct. App. 2012).  The District Court should have done the same, and compelled the Plaintiffs' claims into arbitration.

What the District Court did in creating this policy exception contravenes what is actually the primary purpose of equitable estoppel:  to prevent a party from seeking to impose liability on a nonsignatory while at the same time disclaiming its own obligations under the agreement that gave rise to the dispute. *See Marcus v. Fla. Bagels, LLC*, 112 So. 3d 631, 634 (Fla. Dist. Ct. App. 2013) (noting that concerted misconduct applies because the "relationship among the parties [is] of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement") (cleaned up); *Koechli v. BIP Int'l, Inc.*, 870 So. 2d 940, 945 (Fla. Dist. Ct. App. 2004) (concluding that concerted misconduct doctrine allowed nonsignatory to compel arbitration because the "claims arise out of or are

intimately related to the refurbishment agreement, [and] it would be inequitable to allow [signatory] both to rely upon the agreement in its action against non-signatories and selectively to repudiate it when seeking to resist arbitration"). This requires reversal.

## III. THE DISTRICT COURT ERRED IN CONCLUDING THAT ROCKWELL WAIVED THE FA DEFENDANTS' ARBITRATION  RIGHTS UNDER THE PSAS

Plaintiffs submitted a letter signed by the Rockwell Trustee purporting to waive the PSA arbitration clause *after* First American moved to compel arbitration.  *See* App. Vol. IV at 789-90.[15]  Plaintiffs' counsel both drafted this letter and asked the Rockwell Trustee to sign it after the FA Defendants moved to compel arbitration.  *Id.*  Plaintiffs did so to set up the argument that, by simply signing the letter, the Rockwell Trustee waived the FA Defendants' right to arbitrate.  *See id.* at 775 ("The Court may conclude as a matter of law that Rockwell's waiver leaves no arbitration provision in the PSA for First American to enforce.").  The District Court erred in finding that this letter had any effect.

### A. The District Court Improperly Placed the Burden on the FA Defendants to Disprove Waiver Instead of Requiring Plaintiffs to Prove Waiver

---

[15] During the briefing of the FA Defendants' original motion to compel arbitration, after a telephonic request from Plaintiffs' counsel made the day Plaintiffs' opposition was due, the Rockwell Trustee countersigned a letter written by Plaintiffs' counsel purporting to confirm Plaintiffs' counsel's request that Rockwell waive the arbitration provisions of the PSAs.  App. Vol. IV at 789-90

The District Court improperly put the onus on the FA Defendants to show that its rights *had not been waived*—by blaming the FA Defendants for not introducing applicable law (ignoring the fact that the FA Defendants had done exactly that) and then simply refusing to undertake any analysis. The District Court thus identified no authorities to support the sweeping and remarkable proposition that a party can non-consensually waive the rights of another.

If in fact this issue were not properly presented, that was the fault of the party with the burden of proof and persuasion, which both Florida and Ohio law assign to the Plaintiffs, the parties asserting waiver. *See USPG Portfolio Six, LLC v. Dick's Sporting Goods, Inc.*, 209 N.E.3d 263, 268 (Ohio 2023); *First Protective Ins. Co. v. Ahern*, 278 So. 3d 87, 88 (Fla. Dist. Ct. App. 2019). The Plaintiffs did not satisfy their burdens. The District Court's waiver holding is erroneous for this fundamental reason.

### B.   Neither Rockwell nor Plaintiffs Could Waive the FA Defendants' Vested Rights under Ohio or Florida Contract Law

Putting aside the District Court's incorrect delegation of the burdens (an error of law), the FA Defendants demonstrated that neither Rockwell nor Plaintiffs could nullify the FA Defendants' rights to compel arbitration.

Florida and Ohio law both preclude the Rockwell Trustee from "waiving" the FA Defendants' rights to compel arbitration. Both states follow the majority view expressed in Restatement (Second) of Contracts § 311 (1981), which

provides that a signatory's ability to alter (*i.e.*, waive) a third-party beneficiary's rights "terminates" when the third party beneficiary "changes his position in justifiable reliance on the promise or brings suit on it or manifests assent to it at the request of the promisor or promisee."  Restatement (Second) of Contracts § 311(3); *see also Joseph Bucheck Const. Corp. v. W.E. Music*, 420 So. 2d 410, 414 n.3 (Fla. Dist. Ct. App. 1982) ("Assuming that [third party] was an intended beneficiary of the joint venture agreement, [signatory parties] would have been free to rescind, vary, or abrogate the agreement as they saw fit, without the assent of [third party] ... unless [third party] had accepted, adopted or acted upon it.") (citation omitted); *Gomez v. Huntington Tr. Co., N.A.*, 129 F. Supp. 2d 1116, 1128 (N.D. Ohio 2000) (applying the "majority view" expressed in Restatement § 311 to dispute relating to escrow agreement).[16]

Restatement § 311 is straightforward and dictates that one cannot induce another to rely on a contract (*i.e.*, insist that First American do as the PSAs stated) and then strip the right to arbitrate out of the contract after arbitration has been

---

[16] The District Court stated that the FA Defendants cited no authority for the proposition that signatories cannot waive a third party's rights after those rights have accrued, and then declined to go further.  *See* App. Vol. IV at 1025-27.  The FA Defendants properly cited both Restatement § 311 and precedent from this Court and others establishing and applying these principles.  *Id.* at 885 (citing *Manning v. Wiscombe*, 498 F.2d 1311, 1313 (10th Cir. 1974); *Regions Bank v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 2014 WL 12621478, at *18 (N.D. Ga. Oct. 29, 2014)).  The District Court's refusal to acknowledge, let alone address, those citations was error.

invoked.  Stated another way, the FA Defendants' rights to compel arbitration "vested" as soon as they accepted the PSAs and agreed to (and did) perform as escrow agent.  It was at that moment in time the FA Defendants "materially changed [their] position" by agreeing to act as escrow agent, and justifiably relied on all the terms therein (including the arbitration clause), and their rights to compel arbitration could not be discharged or modified by anyone else.  *See Palm Lake Partners II, LLC v. C & C Powerline, Inc.*, 38 So. 3d 844, 850 (Fla. Dist. Ct. App. 2010) (intended beneficiary's rights "vest" once they have "either accepted the agreement or detrimentally relied upon it"); *United States v. Wood*, 877 F.2d 453, 459 (6th Cir. 1989) (citing Restatement § 311 and noting that "rights vest upon their learning of the contract and assenting to it, [which] represents the majority view among the states").  Moreover, there can be no dispute that the FA Defendants materially changed their position in reliance on the PSAs and arbitration clauses therein at the latest when they *moved to compel arbitration*, which still occurred before Plaintiffs even requested a waiver from the Rockwell Trustee.  Under Restatement § 311, that request (and the purported resulting "waiver") was thus invalid.

### C.    The Purported Waiver was Invalid under the Terms of the PSAs

The purported waiver was also invalid because it did not comply with the PSAs themselves.  Section 14 of each PSA requires all "subsequent

44

modifications" to any PSA to be "in writing and signed by the parties." *See, e.g.*, App. Vol. I at 222 § 14. The letter Plaintiffs procured is not such a writing, and is thus a nullity under the terms of the PSAs. *See Ikerd Scuba Enter. LLC v. Lakes*, 2014 Ohio 533, ¶ 29 (Ohio Ct. App. 2014); *Lynkus Communications v. WebMD Corp.*, 965 So. 2d 1161, 1168 (Fla. Dist. Ct. App. 2007). Plaintiffs' declarations, App. Vol. IV at 792-880, do not even address this problem. Not one mentioned the PSAs, or said anything about amending any portion of any PSAs, or allowing anyone else to do so. There is nothing in the record to show the parties modified any terms of the PSAs in writing.

The District Court's rejection of this argument on the basis that the FA Defendants provided no legal authority on this issue, *id.* at 1026-27, was objectively wrong: The FA Defendants cited Florida and Ohio law on this issue, *id.* at 885, and the District Court did not distinguish or even mention those cases in its decision.

The District Court also erred by ruling that the FA Defendants could not enforce Section 14 of the PSAs as non-parties. This is circular reasoning in that it depends entirely on the District Court's incorrect conclusion that the FA Defendants had no rights under the PSAs, which was both wrong and contravened the rule requiring the District Court to resolve all doubts in favor of arbitration.

Moreover, the District Court's holding relied entirely on the letter described above, *id.* at 1027 n.107, and assumed that letter constituted action by a bankruptcy court. But it was not. As the District Court recognized, a bankruptcy trustee may not "use, sell or lease" property of an estate outside of the ordinary course of business without Bankruptcy Court participation, for which formal notice and an opportunity for a hearing is required. *See id.* at 1026 (citing 11 U.S.C. § 363; *In re Stemwedel*, Case No. 11-39196, 2018 Bankr. LEXIS 3083 at 10 (Bankr. D. Colo. Sep. 27, 2018), *aff'd*, *Stemwedel v. Peak Props. & Dev.* (*In re Stemwedel*), 2019 U.S. Dist. LEXIS 159795 (D. Colo., Sep. 19, 2019)). There is no evidence in the record that (a) such notice was given (because it was not) when Plaintiffs originally sought this supposed waiver or (b) that Plaintiffs took any action in the Rockwell bankruptcy case to cure this issue after the FA Defendants first raised this defect. Had Plaintiffs wanted to seek bankruptcy court approval of the purported waiver, they could have done so before the FA Defendants renewed their motion to compel arbitration, but they did not.

Finally, the text of the letter itself does not support the District Court's decision. The letter states "[a]s confirmed by your signature below, it is my understanding that you, As [sic] Chapter 7 Trustee, on behalf of the Debtor entities, the estate, and all agents, assigns, employees, and representatives thereof,

are waiving" the arbitration clause in the PSAs. App. Vol. IV at 789. The next paragraph says:

> Based on this waiver, both you as Trustee and [Plaintiffs] anticipate that all "disputes between the parties," as described in paragraph 9 of the PSAs, will be resolved by appropriate proceedings in the Bankruptcy, including but not limited to the ordinary processes for resolution of claims.

*Id*. None of that waived the FA Defendants' rights.

*First*, Plaintiffs' counsel requested a waiver on behalf of "all agents, assigns, employees, and representatives" of Rockwell, but Plaintiffs' position is that the FA Defendants were not "agents" of Rockwell and Plaintiffs never alleged that the FA Defendants were "assigns, employees, [or] representatives" of Rockwell. *Second*, the supposedly shared "anticipat[ion]" described in the next paragraph on its face confirms that the "waiver" at most applies to disputes between Plaintiffs and Rockwell, because no other disputes could be handled in "the Bankruptcy" without consent of all parties, including the FA Defendants, as the Supreme Court recently reaffirmed in *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2087 (2024). Plaintiffs' claims against the FA Defendants were not brought in "the Bankruptcy" and Plaintiffs never tried to move them to the Bankruptcy or asked the FA Defendants for consent to do so. And there is no

statutory basis for a Bankruptcy Court to resolve claims by one set of non-debtors against another set of non-consenting non-debtors.  *See id.*[17]

**D.    The District Court Improperly Found That Rockwell or its Bankruptcy Trustee Waived the FA Defendants' Vested Property Rights**

The finding by the District Court that a letter signed by a bankruptcy trustee may waive the rights of third parties is also contrary to the Bankruptcy Code and bankruptcy process.  The District Court first erred by finding that arbitration rights are not property of the estate, App. Vol. VI at 1026, because  "it is well-established (1) that a debtor's contractual rights … are included in the property of his estate and (2) that an attempt to terminate those rights is an act to exercise control over property of the debtor's estate."  *See, e.g.*, *In re Albion Disposal, Inc.*, 217 B.R. 394, 407-08 (W.D.N.Y. 1997).  More importantly, the District Court's focus on *Rockwell*'s rights was misplaced because the inquiry here is whether the Rockwell Trustee's letter had any effect on *the FA Defendants'* rights.

The letter had no legal impact on the FA Defendants' rights.  Although there are provisions of the Bankruptcy Code that grant trustees "power and

---

[17] Put differently, "the ordinary processes for resolution of claims" refers to claims by Rockwell creditors against the Rockwell debtors asserted in the Bankruptcy, which would be resolved using the ordinary processes for bankruptcy court claim determination.  Plaintiffs' claims against the FA Defendants are not such claims.

authority to dispose of [a debtor's] specific property," the Bankruptcy Code "does not, however, purport to alter or redefine the property rights upon which it was designed to operate." *In re Persky*, 134 B.R. 81, 85 (Bankr. E.D.N.Y. 1991). Instead, "[s]tate law and not federal law determines the nature and extent of a debtor's interest in property as of the date of the commencement of his bankruptcy case under all of the authorities—and thus a debtor's ability to change or effect that property." *Id.* (citations omitted).

On this point, the Supreme Court has held that state law governs the extent of a state law property interest, and "[u]niform treatment of property interests by both state and federal courts … serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy." *Butner v. United States*, 440 U.S. 48, 55 (1979). More recently, the Supreme Court confirmed that debtors cannot extinguish litigation rights of one set of third parties versus another set of third parties without the consent of the third parties whose rights are sought to be extinguished. *Purdue Pharma*, 144 S. Ct. at 2086-87.

Here, neither the Plaintiffs nor the District Court cited any statute or authority that allows the Rockwell trustee to waive the FA Defendants' vested arbitration rights. This is because there is no such authority: Both debtors and their trustees are "bound by the arbitration agreements the debtor formed before it

petitioned for bankruptcy protection" and cannot just "waive" other parties' state-law arbitration rights. *See Strong v. Geringer*, No. 2:15-CV-00837-TC, 2016 WL 4926175, at *4 (D. Utah Sept. 15, 2016) (citations omitted). Courts have thus allowed third parties to enforce their arbitration rights against bankruptcy trustees and debtors even when the trustee or debtor does not want to arbitrate. *In re Cont'l Broker-Dealer Corp.*, 368 B.R. 109, 112 n.5 (Bankr. E.D.N.Y. 2007) ("if the Debtor could be compelled to arbitrate, so too can the Trustee be compelled."); *In re Kaiser Group Intern., Inc.*, 307 B.R. 449, 457 (D. Del. 2004).

Simply put, neither a debtor nor a trustee may "waive" its own rights or the rights of another party that could arbitrate. *See In re Mike Hammer Productions, Inc.*, 294 B.R. 752, 754 (B.A.P. 9th Cir. 2003) (rejecting a reading of the Bankruptcy Code that a debtor could waive its own and others' right to a judgment as creating an "anomaly" and "an invitation for abuse."); *In re The Colad Group, Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) ("While the debtor may seek authority to waive its own rights, it cannot waive ... rights of parties who have not consented ... ."); *see also Purdue Pharma*, 144 S. Ct. at 2087 (same). Allowing the waiver of third-parties' rights by just signing a letter drafted by an adverse party would result in the type of "windfall merely by reason of the happenstance of bankruptcy" at the expense of state law contract rights that the Supreme Court warned against. *Butner*, 440 U.S. at 55. The letter written by

Plaintiff's counsel and signed by the Rockwell Trustee had no effect on the

vested, state law rights of the FA Defendants to compel arbitration.

## CONCLUSION

For all the reasons set forth above, the FA Defendants respectfully request

that this Court reverse the District Court and direct it to compel Plaintiffs to

arbitrate their claims against the FA Defendants under the PSAs.

Pursuant to 10th Cir. R. 27.2(C)(2), the FA Defendants state that they believe

oral argument is necessary in this case because:

- Applying the FAA and substantially similar state law, The District Court departed from the reasoning of the Utah Court of Appeals in *Barron*, creating a divergence in the application of the same arbitration clause in cases that are otherwise substantively identical with respect to arbitrability.

- There are significant differences between the parties and the views expressed by the District Court with respect to the applicable law and the content of the factual record, and the Panel may have questions that could be best answered by counsel at oral argument.

- The issues raised in this appeal have significant potential ramifications for federal and state courts across the country, particularly in light of the District Court's reliance on *GE Energy* and *Carlisle* to call into question the continued viability of arbitration-related holdings of both federal and state courts across the country.

Each of these issues warrants having oral argument to permit the parties to address

the Panel and respond to questions it might have.

DATED:  August 9, 2024

Respectfully submitted,

DENTONS US LLP

*s/ Douglas W. Henkin*
DOUGLAS W. HENKIN
1221 Avenue of the Americas
New York, New York  10020-1089
Tel: (212) 768-6832
douglas.henkin@dentons.com

DENTONS DURHAM JONES PINEGAR, P.C.
DAVID W. TUFTS
J. TAYLER FOX
111 South Main, Suite 2400
Salt Lake City, UT 84111
Tel: (801) 415-3000
david.tufts@dentons.com
tayler.fox@dentons.com

*Counsel For Defendants-Appellants*
*First American Title Insurance*
*Company and Kirsten Parkin*

## CERTIFICATE OF COMPLIANCE

1.      Undersigned counsel certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 28.1(e)(2)(A) because it contains 12,588 words.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(A)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated:  August 9, 2024                    *s/ Douglas Henkin*_____
                                          DENTONS US LLP

                                          *Counsel For Defendants-Appellants First American Title Insurance Company and Kirsten Parkin*

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

Dated this August 9, 2024.

*s/ David W. Tufts*

# ATTACHMENT A

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CHRISTPHER C. FUCCI, et al.,<br><br>              Plaintiffs,<br><br>v.<br><br>WILLIAM BOWSER, et al.,<br><br>              Defendants. | **MEMORANDUM DECISION AND ORDER OVERRULING [263] OBJECTION TO MAGISTRATE JUDGE'S MEMORANDUM AND ORDER DENYING RENEWED MOTION TO COMPEL ARBITRATION**<br><br>Case No. 2:20-cv-00004-DBB-DAO<br><br>District Judge David Barlow |

Before the court is First American Title Insurance Company and Kristen Parkin's ("FA Defendants") Objection to the Magistrate Judge's Memorandum and Order Denying FA Defendants' Renewed Motion to Compel Arbitration.[1] The FA Defendants present seven objections to the magistrate judge's Memorandum and Order.

## BACKGROUND

This matter concerns a commercial real estate investment gone wrong. Plaintiffs purchased tenant-in-common interests in real estate development projects in Florida and Ohio.[2] After their investments soured, Plaintiffs sued the seller of these interests, Rockwell Debt Free Properties, Inc., and related parties ("Rockwell").[3] Plaintiffs also sought recovery from First

---

[1] Obj. to Mag. Judge's Oct. 2, 2023 Mem. & Order Den. First Am. Title Ins. Co. and Kirsten Parkin's Renewed Mot. to Compel Arb., ECF No. 263, filed Nov. 3, 2023 [hereinafter Obj.].

[2] Am. Compl. ¶ 14, ECF No. 122, filed Aug. 17, 2021; Decl. of Steven J. Nielsen in Supp. of Renewed Mot. to Compel Arb., ECF No. 220, filed Mar. 1, 2023 [hereinafter First Decl. Steven J. Nielsen].

[3] Am. Compl. ¶¶ 12–13.

American Title Insurance Company ("First American").[4] First American served as escrow agent

and title insurer in closing each of the tenant-in-common sales.[5] Each plaintiff transacted under

separate purchase sales agreements ("PSAs"), and Ms. Parkin acted as the escrow agent for every

transaction.[6]

Plaintiffs contend that the FA Defendants were entrusted with their invested money,

which would be held in escrow.[7] Capital would only be disbursed for land purchases and for

incremental completion of event centers to be built on the properties.[8] Plaintiffs allege that the

FA Defendants instead disbursed the entirety of the fund to Rockwell, which spent the money

and failed to complete any of the planned projects.[9]

The FA Defendants moved to compel Plaintiffs to arbitrate their claims under the Federal

Arbitration Act ("FAA").[10] However, the motion was dismissed without prejudice when the case

was stayed pending the appeal of a related issue in another case.[11] After the stay was lifted, the

FA Defendants filed a renewed motion to compel arbitration on March 1, 2023.[12] On March 29,

Plaintiffs filed their objection.[13] On April 12, the FA Defendants filed their reply in addition to a

---

[4] *Id.* ¶ 13. Plaintiffs allege that the FA Defendants improperly managed their escrow account, giving rise to six claims in their Amended Complaint. These include breach of fiduciary duty, aiding and abetting tortious conduct, conspiracy to engage in tortious conduct, materially aiding state-law securities fraud, unjust enrichment, and abuse of vulnerable adults. Am. Compl. ¶¶ 86–89, 91–96, 106–111.
[5] *Id.*
[6] *Id.* ¶ 12.
[7] *Id.* ¶¶ 129–30.
[8] *Id.* ¶ 130; Mem. and Order Den. First Am. Title Ins. Co. and Kirsten Parkin's Renewed Mot. to Compel Arb. and Overruling Their Obj. to Evid. 4, ECF No. 258, filed Oct. 2, 2023 [hereinafter Order].
[9] Am. Compl. ¶ 433(b).
[10] FA Defs.' Mot. to Compel Arb., ECF No. 126, filed Sept. 16, 2021.
[11] Docket Text Order, ECF No. 149, entered Dec. 9, 2021. The other case is *DiTucci v. Ashby*, No. 2:19-cv-00277, 2021 WL 778579 (D. Utah March 1, 2021).
[12] FA Defs.' Renewed Mot. to Compel Arb., ECF No. 219, filed Mar. 1, 2023 [hereinafter Mot. to Compel Arb.].
[13] Pls.' Obj. to Renewed Mot. to Compel Arb., ECF No. 225, filed Mar. 29, 2023.

second Declaration of Steven J. Nielsen, and an objection to evidence presented in Plaintiffs'
objection.[14]

 The magistrate judge held a hearing on the pending motion and objections on June 20,
2023.[15] During the hearing, Plaintiffs' counsel presented new evidence and legal authority to
support their argument relating to Ohio arbitration law.[16] A "briefing odyssey" ensued.[17] The
magistrate judge granted leave to the FA defendants to file a supplemental brief to respond to the
new information presented during the hearing.[18] That brief was filed on June 27, 2023, which
added the new information to the record.[19] Plaintiffs sought and obtained leave to file their own
supplemental response to FA Defendants' brief.[20] Without seeking leave, FA Defendants then
filed another supplemental brief and a fourth Steven J. Nielsen Declaration on July 19, 2023.[21]
Plaintiffs filed an evidentiary objection on July 26, 2023,[22] and FA Defendants responded once
more on July 31, 2023.[23] The parties' supplementary filings concluded with the FA Defendants'
Notice of Supplementary Authority on September 12, 2023.[24]

 On October 2, 2023, the magistrate judge entered the Memorandum Decision and Order
Denying FA Defendants' Renewed Motion to Compel Arbitration (the "Order").[25] FA

---

[14] FA Defs.' Reply to Resp. to Mot. to Compel Arb., ECF No. 226, filed Apr. 12, 2023; Second Decl. Steven J.
Nielsen, ECF No. 227, filed April 12, 2023; Obj. to Evid., ECF No. 228, filed Apr. 12, 2023.
[15] Minute Entry, ECF No. 243, entered June 20, 2023.
[16] Pls.' Resp. to FA Defs.' Obj. to Mag. Judge's Oct. 2, 2023 Mem. and Order 4, ECF No. 268, filed Dec. 22, 2023
[hereinafter Pls.' Resp.].
[17] *Id.*
[18] Minute Entry, ECF No. 243, entered June 20, 2023.
[19] FA Defs.' Suppl. Brief in Supp. of Renewed Mot. to Compel Arb., ECF No. 244, filed June 27, 2023.
[20] Pls.' Supp. Resp. to Mot. to Compel Arb., ECF No. 250, filed July 12, 2023.
[21] FA Defs.' Resp. to Pls.' Suppl. Mem. and Obj. to Evid., ECF No. 251, filed July 19, 2023; Decl. Steven J.
Nielsen, ECF No. 252, filed July 19, 2023 [hereinafter Fourth Decl. Steven J. Nielsen].
[22] Pls.' Obj. to Fourth Decl. of Steven J. Nielsen and Obj. to FA Defendants' July 19, 2023 Resp., ECF No. 253,
filed July 26, 2023.
[23] FA Defs.' Resp. to Pls' Objs., ECF No. 254, filed July 31, 2023.
[24] FA Defs.' Notice of Supp. Auth. ECF No. 255., filed Sept. 12, 2023.
[25] Order 1.

Defendants objected to the Order on November 3, 2023.[26] Plaintiffs filed their response on

December 22, 2023.[27]

## STANDARD

Under Fed. R. Civ. P. 72, orders of a magistrate judge on non-dispositive matters are

reviewed based on a "clearly erroneous or contrary to law" standard, while dispositive matters

are reviewed de novo. FA Defendants argue that "the court should review the order *de novo*

because it is the functional equivalent of a dispositive motion expressly excepted under 28

U.S.C. § 636(b)(1)(A)."[28] Courts in the Tenth Circuit have applied both standards on a motion to

compel arbitration.[29] The court need not decide this issue because the result here is the same

under either standard.

## DISCUSSION

The Federal Arbitration Act allows federal courts to enforce arbitration agreements.[30] To

that end, courts may issue "an affirmative order to engage in arbitration."[31] In deciding a motion

to compel arbitration, a court must determine whether there is a valid agreement to arbitrate, and

whether the dispute in question falls within the scope of that agreement.[32]  Regarding whether

there is a valid agreement to arbitrate, courts utilize framework "similar to summary judgment

---

[26] Obj.
[27] Pls.' Resp.
[28] Obj. 4.
[29] *Judd v. KeyPoint Gov't Sols., Inc.*, No. 18-cv-00327, 2018 WL 3526222, at *1 n.1 (D. Colo. July 23, 2018), *R. & R. adopted*, 2018 WL 6603888 (D. Colo. Dec. 4, 2018); *see also Smith v. AHS Okla. Heart, LLC*, No. 11-CV-691, 2012 WL 3156878, at *1 n.1 (N.D. Okla. June 6, 2012), *R. & R. adopted*, 2012 WL 3156877 (N.D. Okla. Aug. 3, 2012) (citing *Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1140–41 (D. Colo. 2012), *aff'd*, 925 F. Supp. 2d 1185 (D. Colo. 2013)) ("The Tenth Circuit has not resolved the issue.").
[30] 9 U.S.C. § 4.
[31] *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983).
[32] *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).

practice."[33] Where "the parties dispute the existence of an agreement to arbitrate, a court may

grant a motion to compel arbitration if 'there are no genuine issues of material fact regarding the

parties' agreement.' Courts 'should give to the opposing party the benefit of all reasonable

doubts and inferences that may arise.'"[34] The moving party must present "evidence sufficient to

demonstrate the existence of an enforceable agreement."[35] If sufficient evidence of an

enforceable agreement is presented, the burden then shifts to the nonmoving party to "raise a

genuine dispute of material fact regarding the existence of an agreement."[36]

Once it is determined that there is a valid agreement to arbitrate, a court must determine

whether the dispute in question falls within the scope of the agreement. When addressing

whether a dispute is arbitrable "any doubts concerning the scope of arbitrable issues should be

resolved in favor of arbitration."[37]

Under this framework, the Order denied FA Defendants' Motion to Arbitrate. FA

Defendants do not object to the Order's findings that the court has the authority to determine the

validity of the Arbitration Agreement and its enforceability on Plaintiffs.[38] The parties also do

not dispute that the PSAs contain valid arbitration clauses.[39] Their disagreements center on

whether the FA Defendants were parties to the agreement and, in the alternative, whether they

---

[33] *Hancock v. American Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012).
[34] *Id.* (quoting *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997); *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980)).
[35] *Id.*
[36] *Id.*
[37] *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1281 (10th Cir. 2017) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).
[38] Obj. 4–5.
[39] Order 7.

can enforce the arbitration agreements as nonsignatories under equitable estoppel, agency, or third-party beneficiary theories.[40]

## I.   Whether the FA Defendants Were Parties to the PSAs.

FA Defendants first object to the magistrate judge's conclusion that they are not parties to the PSAs. The Order ruled that under Ohio and Florida law, the FA Defendants were not "parties" under the plain language of the sales agreements.[41]

FA Defendants contend that they are parties to the arbitration agreement despite the fact they did not sign the PSAs. They instead argue that both Ohio and Florida law provide "that a nonsignatory is deemed a party to a contract so long as the signatory assents to its obligations under the contract."[42] Thus, FA Defendants contend that Plaintiffs and the Rockwell defendants assented to an agreement to allow FA Defendants to arbitrate any disputes under the PSA. In doing so, they point to the text of the arbitration clause. It encompasses "[a]ny dispute between the parties."[43] FA Defendants reason that because Black's Law Dictionary defines "party" as "someone who takes part in a transaction," the Rockwell Defendants and the Plaintiffs intended that the FA Defendants were included in the meaning of the term "parties" in the arbitration clause because of their role in the sale.[44] This includes acting as the escrow agent and by insuring each Plaintiff in the amount of the purchase price. Thus, under their theory, the FA Defendants can compel Plaintiffs to arbitrate because the PSAs "contemplated that the FA Defendants would participate in the transactions."[45]

---

[40] Obj. 5–14.
[41] Order 9–11.
[42] Obj. 5.
[43] *E.g.*, First Decl. Steven J. Nielsen Ex. 27 ¶ 9.
[44] *Id.*
[45] Obj. 6.

The Supreme Court has held that "arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit."[46] This is because "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration."[47] If there is a question as to whether a party did not agree to submit to arbitration, state contract law controls. This is because the Federal Arbitration Act "does not alter background principles of state contract law regarding the scope of agreements . . . including the question of who is bound by them."[48]

State law applies here because the parties raise an issue regarding whether the Plaintiffs agreed to arbitrate with the FA Defendants.[49] Each of the PSAs contains a choice of law provision that specifies which state's law governs their construction. The PSAs for the Ohio Properties are governed by Ohio law,[50] and the PSAs for the Florida Property are governed by Florida law.[51]

### A.  Ohio Law

Under Ohio law, signatures are not required to enforce or be bound by arbitration contracts.[52] "It is only necessary that the provision be in writing and it is not required that such writing be signed."[53] Ohio courts have held that an arbitration clause in a contract is enforceable regardless of whether the party seeking to compel arbitration signed the agreement.[54]

---

[46] *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quotation and citation omitted).
[47] *Id.*
[48] *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 630 (2009).
[49] *See, e.g.,* Pls.' Resp. 4.
[50] *E.g.*, First Decl. Steven J. Nielsen Ex. 27 ¶ 18.
[51] *E.g.*, First Decl. Steven J. Nielsen Ex. 25 ¶ 18.
[52] *Brumm v. McDonald & Co. Securities*, 603 N.E.2d 1141, 1145–46 (Ohio Ct. App. 1992).
[53] *Id.*
[54] *See, e.g.*, *Id.*; *Ross v. Bridgewarter Constr. Inc.*, 2003 WL 22736578, at *2 (Ohio Ct. App. Nov. 21, 2003).

"Arbitration is a matter of contract and a party cannot be required to submit a dispute to arbitration when it has not agreed to do so. Therefore, a court is required to 'look first to whether the parties agreed to arbitrate a dispute, not to general policy goals to determine the scope of the agreement.'"[55]

"A valid and enforceable contract requires an offer by one party and an acceptance of the offer by another party."[56] Offer and acceptance requires a meeting of the minds.[57] "In order for a meeting of the minds to occur, both parties to an agreement must mutually assent to the substance of the exchange."[58]

Here, the issue centers on whether a meeting of the minds occurred between the three groups of individuals, the Rockwell Defendants, the FA Defendants, and the Plaintiffs. In order for the FA Defendants to enforce the arbitration agreement under the PSAs, there must be some manifestation that the relevant individuals and entities agreed to arbitrate any disputes stemming from the PSAs. This is a question of contract interpretation.

Under Ohio law regarding the interpretation of contracts, it is the court's role "to give effect to the intent of the parties to the agreement."[59] Intent is presumed to reside in the agreed upon contractual language.[60] "Common words will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clearly evidenced from the face or overall content of the contract. If the language in a contract is clear and unambiguous, the court

---

[55] *One Lifestyle, Ltd. v. Mohiuddin*, 172 N.E.3d 507, 513 (Ohio Ct. App. 2021) (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)).
[56] *Mohiuddin*, 172 N.E.3d at 513.
[57] *Id.*
[58] *Id.* (citations omitted).
[59] *Kellie Auto Sales, Inc. v. Rahbars & Ritters Ents., L.L.C.*, 876 N.E.2d 1014, 1019 (Ohio Ct. App. 2007).
[60] *Id.* (citing *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146 (Ohio 1978)).

cannot create a new contract by finding an intent not expressed in the clear language employed by the parties."[61]

Here, the text of the PSAs does not support a finding that there was a meeting of the minds between the three groups of individuals and entities that the FA Defendants agreed to arbitrate. The signature block states that the "parties have set their hands" to the document, and the only signers are the Rockwell Seller and Plaintiff Buyer.[62] The agreements also state that they are "made . . . by and between" each seller and buyer with no mention of any other parties.[63] The terms "buyer" and "seller" consistently refer exclusively to Rockwell and each Plaintiff throughout the PSAs.[64] Thus, the plain text of the agreement is clear that only the Rockwell entities and each individual plaintiff agreed to arbitrate disputes under the PSA. This finding is consistent with FA Defendants' own argument in another filing before the court where they argued that they were not parties to the PSAs.[65]

FA Defendants further object that because the "FA Defendants were an integral part of the transactions under the PSAs," the parties must have intended to arbitrate. They point to several instances where the PSAs delegated "specific and exclusive duties" to First American as evidence that they "manifested their intent to be bound as a party to the PSAs."[66] However, none of these obligations delegated to First American indicate that they also intended to arbitrate.

---

[61] *Id.* (citing *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146 (Ohio 1978).
[62] *E.g.*, First Decl. Steven J. Nielsen Ex. 1, at 9. The Seller in this contract is Rockwell Dublin, a Utah limited liability company.
[63] *E.g.*, *id.* at 3.
[64] *See* First Decl. Steven J. Nielsen.
[65] FA Defs.' Reply in Supp. of Mot. to Dismiss 4 n.6, 5, ECF No. 58, filed May 20, 2020.
[66] Obj. 5. FA Defendants point to paragraphs 2.2, 3.2, 3.4, and 3.5 of the PSAs.

9

Indeed, the court cannot look to general policy goals, such as the parties' alleged implied intent to bind First American to the arbitration clause, to override the plain language of the PSAs. However "integral" First American's role was in the transactions, the fact remains that the text makes clear that First American was not a "party" to the PSAs. The court also similarly rejects the notion that the court may look to extrinsic sources, such as Black's Law Dictionary or a title insurance treatise, to change the clear intent of the parties to the PSAs.

The text of the PSAs does not indicate that the FA Defendants were "parties" to the agreement. Accordingly, they are not entitled to compel arbitration under this theory.

### B.  Florida Law

Under Florida law, "[a]rbitration clauses are construed according to basic contract interpretation principles."[67] "An obligation to arbitrate is based on consent, 'and for this reason a non-signatory to a contract containing an arbitration agreement ordinarily cannot compel a signatory to submit to arbitration.'"[68] "The plain language of the agreement containing the arbitration clause is the best evidence of the parties' intent. The arbitration clause must be read together with other provisions in the contract."[69]

Thus, because the analysis again focuses on the plain language of the PSAs, the result is the same under Florida law as it is under Ohio law. As noted above, the plain language of the PSAs does not indicate that there was a meeting of the minds that the parties to the agreements agreed to arbitrate disputes with the FA Defendants.

---

[67] *Bari Builders, Inc. v. Hovstone Props. Fla., LLC*, 155 So. 3d 1160, 1162 (Fla. Dist. Ct. App. 2014) (citing *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999)).
[68] *Marcus v. Florida Bagels*, 112 So. 3d 631, 633 (Fla. Dist. Ct. App. 2013) (quoting *Roman v. Atl. Coast Constr. & Dev., Inc.*, 44 So. 3d 631, 633 (Fla. Dist. Ct. App. 2010)).
[69] *Bari Builders*, 115 So. 3d at 1162.

**II.      Whether the FA Defendants Were Third Party Beneficiaries of the PSAs**

FA Defendants argue that they can compel arbitration because they were third-party beneficiaries of the agreements. They contend that this court should follow the reasoning in a recent Utah appellate decision, *First American Title Insurance Company v. Barron*.[70] FA Defendants correctly point out that *Barron* applied Colorado law, not Ohio or Florida law. It thus has little bearing here.[71]

FA Defendants further contend that the analysis in *Barron* applies here because Ohio and Florida courts have similar standing requirements for a third-party beneficiary to those the Utah court of appeals found to apply under Colorado law.[72] This is too attenuated. Ohio and Florida courts hold that a third party must have something more than an incidental or inconsequential benefit from the contract. FA Defendants conclude that the PSAs clearly benefitted First American because the PSAs designated it as the escrow agent and issuer of the title policies.[73]

The court first notes that review of a magistrate judge's decision is compelled when a timely objection is filed, but "issues raised for the first time in objections to a magistrate judge's recommendation are deemed waived."[74] *Plaintiffs* first raised the issue of third-party beneficiary status in their objection to FA Defendants' Motion to Compel Arbitration. They stated that "FA does not directly assert that it is a third-party beneficiary of the PSA, and certainly there is no

---

[70] 540 P.3d 623 (Utah Ct. App. 2023).

[71] As stated before, state law is applicable here because the Tenth Circuit has held that the issue of whether a non-signatory can compel arbitration under an arbitration agreement is governed by state law. *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1293 (10th Cir. 2018) (citing *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009).

[72] Obj. 6. FA Defendants quote a holding from *Barron* and ask the court to compare that holding to similar holdings in Ohio and Florida cases, *Huff v. FirstEnergy Corp.*, 957 N.E.2d 3, 7 (Ohio 2011) and *Germann v. Age Inst. of Fla., Inc.*, 912 So. 2d 590, 592 (Fla. Dist. Ct. App. 2005).

[73] Mot. to Compel Arb. 9.

[74] *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996).

serious argument that they could be."[75] In their reply, FA Defendants failed to respond to the allegation that they did "not directly assert that [they] are a third-party beneficiary."[76] The court notes that this argument was likely waived.  Regardless, the court addresses the substance of this argument.

Under Florida law, the party claiming third-party beneficiary status bears the burden of demonstrating that it was a beneficiary of the contract.[77] The party must demonstrate that it received something more than "an incidental or inconsequential benefit from the contract."[78] This is apparent "only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party . . . ."[79]

Similarly, Ohio law also requires that a party must demonstrate that a "contract was entered into directly or primarily for the benefit of that person."[80] "If the promisee intends that a third-party should benefit from the contract, then that third party is an 'intended beneficiary' who has enforceable rights under the contract."[81] "If the promisee demonstrates no intent to benefit a third party, then any third party beneficiary to the contract is merely an 'incidental beneficiary,' who has no enforceable rights under the contract."[82] "The mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract is insufficient;

---

[75] Pls.' Obj. to Renewed Mot. to Compel Arb., ECF No. 225, filed Mar. 29, 2023.

[76] *See* FA Defs.' Reply to Resp. to Mot. to Compel Arb., ECF No. 226, filed Apr. 12, 2023.

[77] *Williams v. Tony*, 319 So. 3d 653, 657 (Fla. Dist. Ct. App. 2021).

[78] *Id.* (quoting *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.*, 647 So. 2d 1028, 1030–31 (Fla. Dist. Ct. App. 1994)).

[79] *Id.* (quoting *Caretta Trucking*, 647 So. 2d at 1031).

[80] *Caruso v. Natl. City Mtge. Co.*, 931 N.E.2d 1167, 1171–72 (Ohio Ct. App. 2010).

[81] *Hill v. Sonitrol of Sw. Ohio, Inc.*, 521 N.E.2d 780, 784 (Ohio 1988) (quoting *Norfolk & W. Co. v. United States*, 641 F.2d 1201, 1208 (6th Cir. 1980)).

[82] *Id.* at 784–85.

12

rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary."[83]

The analysis is the same under Ohio or Florida law.[84] Under both states' law, courts look first to the terms of the contract at issue to determine whether a party is an intended third-party beneficiary.[85] The PSAs only reference First American four times. The first reference states that "the balance of the purchase price shall be wired . . . to First American Title Company within twenty-four hours of closing."[86] The next three references only apply "in the event the Buyer desires to . . . [pay] any portion of the Purchase price . . . with funds Buyer desires to qualify as a 1031 Exchange" under Section 1031 of the I.R.S. Code of 1986.[87]

References to First American in the PSAs do not establish that the parties owed a duty to the FA Defendants.  For example, the parties' agreement that "the balance of the purchase price" was to be transferred to First American does not indicate that the performance of that provision satisfied a duty owed to First American. Regarding the other references in the agreements to First American, a plaintiff's option to utilize a 1031 Exchange does not demonstrate intent to benefit First American at all, much less "primarily and directly." Moreover, the PSAs do not state whether or how much First American should be compensated. Because the PSAs do not establish

---

[83] *Id.* at 85.
[84] *See Huff v. FirstEnergy Corp.*, 957 N.E.2d, 3, 7 (Ohio 2011); *Williams*, 319 So. 3d at 657.
[85] *See Huff v. FirstEnergy Corp.*, 957 N.E.2d, 3, 7 (Ohio 2011); *Williams*, 319 So. 3d at 657.
[86] First Decl. Steven J. Nielsen, Ex. 1, ¶ 2.2.
[87] *Id.* ¶ 3. If the buyer chooses to pay with 1031 funds, the PSAs state that the "Eastern 1031 Starker Exchange" should periodically transfer the 1031 funds to First American Title Company, who then is required to apply the funds either towards the purchase of an undivided interest in the property or the construction of improvements on the property on a reimbursement basis. *Id.* ¶ 3.2. The Seller (Rockwell) has the duty to provide statements to First American to provide statements indicating the costs for which it should be reimbursed. *Id.*

that First American was owed any duties by the signatories, Defendants failed to demonstrate that they are third-party beneficiaries under either state's law.

### III.   Enforceability of the Arbitration Provisions under FA Defendants' Agents of Rockwell Theory[88]

FA Defendants object to the magistrate judge's determination that they are not agents of Rockwell under Ohio or Florida law.[89] Under Ohio law "[a]n agency relationship is created when a principal has the right to control the actions of its agent, and when the agent's actions are in furtherance of an objective that the principal seeks."[90] "The basic test is whether the principal has the right of control over the manner and means of the work being done."[91] Similarly, Florida law provides that "'[e]ssential to the existence of an actual agency relationship is (1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent.'"[92] In Florida too, "[w]hen one considers an action based on actual agency, it is the right to control, rather than actual control, that may be determinative."[93]

As the magistrate judge noted, Plaintiffs' description of FA Defendants as being the "escrow agent" or "closing agent" describes FA Defendants' role in the transaction, not the legal status of a common-law agent. "An escrow holder is not a common-law agent because the holder does not act subject to the control of the parties to the escrow agreement."[94] Here, the PSAs do

---

[88] FA Defendants assert their equitable estoppel argument as their third objection, then their agency theory objection fourth, and the waiver issue fifth. The court responds to the objections out of the order presented to simplify the analysis. The court addresses the agency objection, then waiver, and then equitable estoppel.
[89] Obj. 9.
[90] *Wells v. Komatsu Am. Int'l Co.*, 835 N.E.2d 771, 776 (Ohio Ct. App. 2005) (citing *Hansen v. Kynast*, 494 N.E.3d 171, 173 (Ohio 1986).
[91] *Id.* (citation omitted).
[92] *Goldschmidt v. Holman*, 5 71 So.2d 422, 424 (Fla. 1990) (quoting Restatement (Second) of Agency § 1 (1957)).
[93] *Villazon v. Prudential Health care Plan, Inc.*, 843 So.2d 842, 852 (Fla. 2003).
[94] *Escrow Agent*, *Black's Law Dictionary* (11th ed. 2019).

14

not provide for either party having the right to control the FA Defendants. Because the FA

Defendants have not shown that Rockwell had the right to control the FA Defendants, they have

not established an agency relationship under Ohio or Florida law.

### IV.   Reliance on Rockwell's Purported Waiver of Arbitration Clause

FA Defendants object to the magistrate judge's finding that Rockwell's Chapter 7 trustee

waived the Rockwell Defendants' arbitration rights in the PSAs. They contend that the

magistrate judge improperly relied on the trustee's letter and "ignored" their briefing explaining

that (1) the trustee lacked power to waive the arbitration clause, (2) the waiver did not comply

with the modification clause in the PSAs, and (3) Rockwell could not waive the FA Defendants'

rights after they accrued.[95] These objections lack clarity—parties are obligated to identify the

specific reasons why they object to a magistrate judge's order.[96]

Objections to a magistrate judge's order must be both timely and specific.[97] An objection

is sufficiently specific if it "enables the district judge to focus attention on those issues—factual

and legal—that are at the heart of the dispute."[98] Without further explanation, FA Defendants

conclusorily assert that the magistrate judge ignored their briefing which argued that "[t]he

trustee lacked power to waive the arbitration clause because it did so without Bankruptcy Court

participation."[99] They support their assertion with a footnote citation to a Colorado bankruptcy

court case.[100] The court assumes that the FA Defendants object to the magistrate court's finding

---

[95] Obj. 10.

[96] A request for "the district court to reconsider the magistrate's report and recommendation based on the [filings] . . . [already] submitted to the court" is an insufficient objection. *One Parcel*, 73 F.3d at 1060.

[97] *United States v. One Parcel of Real Property Known as 2121 E. 30th St.*, 73 F.3d 1057, 1059 (10th Cir. 1996).

[98] *Id.*

[99] Obj. 10.

[100] Obj. 10 (citing *In re Stemwedel*, No. 11-39196, 2018 Bankr. LEXIS 3083 at 10 (Bankr. D. Colo. Sept. 27, 2018, *aff'd*, *Stemwedel v. Peak Props & Dev.*, 2019 LEXIS 159795 (D. Colo. Sept. 19, 2019)).

that the bankruptcy trustees had authority to waive the signatories' arbitration rights, thereby rejecting FA Defendants' argument that section 363 of the bankruptcy code denied the trustees the ability to waive arbitration rights.[101]

As explained by the magistrate judge, 11 U.S.C. § 363(b)(1) requires that bankruptcy trustees may not "deal with the property of the estate" unless formal notice and an opportunity for a hearing before the bankruptcy court are provided. FA Defendants argued in their reply briefing to their Motion to Compel Arbitration that arbitration rights are "property of the estate" and that formal notice and an opportunity for a hearing were required before the trustees waived them.[102] The magistrate judge noted that FA Defendants did not provide any authority supporting the assertion that arbitration rights are "property of the estate," nor did they address the factors used to determine what constitutes "property of the estate" under § 363(b)(1).[103] FA Defendants failed to address this flaw in reiterating the same argument in their objection.[104]

Next, FA Defendants assert that the PSAs required modifications be made "in writing and signed by the parties."[105] Because this issue deals with the scope of the contract enforced by a non-party, "traditional principles of state law" govern the issue.[106] However, FA Defendants

---

[101] Order 18.

[102] FA Defs.' Reply to Resp. to Mot. to Compel Arb 1, ECF No. 226, filed April 12, 2023.

[103] Order 18. The magistrate judge further explained that 11 U.S.C. § 541(a)(1) defines property of the estate as "all legal or equitable interests of the debtor *in property* as of the commencement of the case." Order 18 n.82 (citing *Colbert v. Littman (In re Wagenknecht)*, 971 F.3d 1209, 1213 (10th Cir. 2020) (stating "property interests are created and defined by state law" but informed by federal bankruptcy law, and identifying "two tests to determine whether a debtor has legal or equitable interests in the transferred property" (internal quotation marks omitted)).

[104] Moreover, the authority FA Defendants cited in making their objection does not address the waiver of arbitration rights as being "property of the estate." *See* Obj. 10 n.13 (citing *In re Stemwedel*, 2018 Bankr. LEXIS 3082 (Bankr. D. Utah Sept. 27, 2018)).

[105] Obj. 10.

[106] *Arthur Anderson*, 129 U.S. at 631. Under Ohio law, waiver is considered under a totality of the circumstances test to determine whether the waiving party acted inconsistently with a known right to arbitrate. *Crosscut Capital, LLC v. DeWitt*, 173 N.E.3d 536, 540 (Ohio Ct. App. 2021). A court considers "(1) whether the party seeking arbitration invoked the court's jurisdiction by filing a complaint or claim without first requesting a stay; (2) the delay, if any, by the party seeking arbitration to request a stay; (3) the extent to which the party seeking arbitration has participated in

failed to provide any legal authority on the issue. Additionally, they failed to demonstrate how they could enforce a contractual right as a non-party—especially when the parties waived their arbitration rights in bankruptcy court.[107]

Lastly, FA Defendants contend that Rockwell lacked the ability to waive FA Defendants' arbitration rights after they "accrued."[108] In doing so, FA Defendants cite only to an unreported Northern District of Georgia decision applying "general principles of third-party beneficiary law" rather than Ohio or Florida law.[109] As explained previously, state law governs this issue.[110] Regardless, FA Defendants have failed to show that they had any rights to arbitration under the PSAs, much less rights that had "accrued."

## V.   Enforceability of the Arbitration Provisions under Equitable Estoppel

Defendants next object to the Order's conclusion that the FA Defendants "f[e]ll outside the intended and explicit reach of the arbitration clauses," precluding them from relying on principles of equitable estoppel to compel arbitration.[111] Both Ohio and Florida law allow a signatory to be estopped from "avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."[112]

---

the litigation; and (4) whether prior inconsistent acts by the party seeking arbitration would prejudice the non-moving party." *Morris v. Morris*, 939 N.E.2d 928, 937 (Ohio Ct. App. 2010). Similarly, under Florida law, "the essential question is whether, under the totality of the circumstances, the defaulting party has acted inconsistently with the arbitration right." *Raymond James Fin. Servs., Inc. v. Saldukas*, 896 So. 2d 701, 711 (Fla. 2005).
[107] Response to Motion to Compel Ex. A, ECF No. 225, filed March 29, 2023.
[108] Obj. 10.
[109] *Regions Bank v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 2014 WL 12621478, at *18 (N.D. Ga. 2014) (citing *Manning v. Wiscombe*, 498 F.2d 1311, 1313 (10th Cir. 1974)).
[110] *Arthur Anderson*, 129 U.S. at 631.
[111] Obj. 7 (quoting Order at 12).
[112] *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 8 (Ohio Ct. App. 2004); *see Greene v. Johnson*, 276 So .3d 527, 531 (Fla. Dist. Ct. App. 2019) ("the doctrine of equitable estoppel on the basis of intertwined claims . . . applies

### A.    Ohio Law

Under Ohio law, "[a]rbitration agreements apply to nonsignatories only in rare circumstances."[113] A signatory may be estopped from "avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."[114] There are two instances where equitable estoppel may be applied involving "intertwined claims."[115] First, a nonsignatory can compel arbitration if the "signatory must rely on the terms of the written agreement in asserting claims against a nonsignatory."[116] Second, equitable estoppel binds a signatory to an arbitration clause if "the signatory alleges substantially interdependent and concerted misconduct by both the nonsignatory and one or more signatories to the contract."[117] The court addresses whether either form of intertwined claims estoppel may apply here.

### 1.    Intertwined Claims: Reliance on Terms of Agreement

Under the first form, which requires a finding that the signatory relies on terms of the agreement in question in asserting claims against the nonsignatory, "[t]he test is whether the . . . [non-consenting litigant] has asserted claims that arise from the contract containing the arbitration clause."[118] Where the non-consenting party asserts claims against the arbitration-seeking party that arise from the contract containing the arbitration clause, that non-consenting

---

when a signatory to a contract containing the arbitration clause raises allegations of interdependent and concerted misconduct by both a non-signatory and one or more of the signatories to the agreement.").

[113] *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 8 (Ohio Ct. App. 2004).

[114] *Id.* (quoting *Thomson-CSF, S.A. v. American Arb. Ass'n*, 64 F.3d 773, 770 (Ohio Ct. App. 1995).

[115] *I Sports*, 813 N.E.2d at 8.

[116] *Id.*

[117] *Id.*

[118] *Taylor v. Ernst & Young, L.L.P.*, 958 N.E.2d 1203, 1213 (Ohio 2011); *see Atricure, Inc. v. Meng*, 12 F.4th 516, 527 (6th Cir. 2021) (applying Ohio law and reasoning that "estoppel exists to compel a *nonconsenting litigant* to the arbitration table because of its inconsistent positions about whether the contract's other terms apply as between the two litigants.").

party may not inconsistently invoke contractual terms, claiming that one term governs the relationship while the arbitration clause does not.[119] Ohio courts apply the "arising from the contract" test strictly. "[I]t is not sufficient that the plaintiff's claims 'touch matters' concerning the agreement or that the claims are 'dependent upon' the agreement."[120] And "even if a noncontract claim . . . depends on a showing of a breach of contract," Ohio courts will often reject estoppel claims.[121]

Put simply, the key to the analysis is identifying the basis of the non-consenting parties' claims against the parties seeking to compel arbitration. And under Ohio law, Plaintiffs must rely on the terms of the contract containing the arbitration clause in asserting claims against the FA Defendants.[122] Defendants point to Paragraph 412 of the Complaint, which pertains to Plaintiffs' claim that the FA Defendants breached their fiduciary duty regarding their escrowed funds.[123]

First, some context is needed. The relevant section of the Complaint begins by establishing the basis of First American's fiduciary obligations. Paragraph 408 avers that "Plaintiffs were not provided with a separate escrow agreement," but the FA Defendants still had specific fiduciary obligations for various reasons.[124] The first reason listed: FA Defendants had obligations to Plaintiffs who "carr[ied] out a 1031 Exchange" as "expressly provided" by the PSAs.[125] The other reasons provided also deal with First American's role in executing the 1031

---

[119] *Id.*
[120] *I Sports*, 813 N.E.2d at 9 (quoting *Hill v. G.E. Power Sys., Inc.*, 282 F.3d 343, 348 (5th Cir. 2002)).
[121] *Atricure, Inc. v. Meng*, 12 F.4th 516, 527 (6th Cir. 2021) (citing *Church v. Fleishour Homes, Inc.*, 874 N.E.2d 795, 806–07 (Ohio Ct. App. 2007).
[122] *I Sports*, 813 N.E.2d, at 8 ("a signatory must rely on the terms of the written agreement in asserting claims against a nonsignatory.").
[123] Obj. 8.
[124] Am. Compl. ¶ 408.
[125] Am. Compl. ¶ 408(a).

Exchange obligations.[126] For example, paragraph 408(d) explains that their failure to comply with applicable 1031 Exchange rules "would subject Plaintiffs to risk that their funds would be misappropriated, diverted, or converted from the [intended] purpose."[127]

Paragraph 412 of the Complaint alleges the various ways that the FA Defendants breached their fiduciary duty. Plaintiffs aver that FA Defendants "fail[ed] to provide or require a written escrow agreement," "fail[ed] to communicate to Plaintiffs that their payment of the TIC Investment would be immediately disbursed," "disburs[ed] funds from the escrow at the request of Rockwell without ensuring that the funds would be used in connection with the intended TIC property," "fail[ed] to follow the express requirements of the Purchase and Sale Agreement between Rockwell and the TIC Owners . . . including . . . paragraph 3.2, "disburs[ed] the escrow funds to Rockwell without any agreement or consent of the Plaintiffs," and "[o]therwise fail[ed] to exercise due care and loyalty to safeguard Plaintiff's funds."[128]

In short, Plaintiffs allege two bases for the duties FA Defendants' owed to them. First, they allege that FA Defendants' fiduciary duties stem from their role as an escrow agent, the specifics of which were established in non-PSA agreements. Second, Plaintiffs contend that the PSAs specify certain fiduciary duties regarding 1031 Exchange funds.[129] The claims, however, arise from alleged tortious conduct—the breach of fiduciary duties owed to Plaintiffs. Plaintiffs do not assert breach of contract claims against FA Defendants.[130] And to the extent the existence

---

[126] Am. Compl. ¶¶ 408(b)–(d).
[127] Am. Compl. ¶ 408(d).
[128] Am. Compl. ¶ 412.
[129] Am. Compl. ¶ 408(b), (d).
[130] *See I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d. 4, 10 (Ct. App. Ohio 2004).

of some specific fiduciary duties may be dependent on terms in the PSAs, Plaintiffs' claims seek

to enforce duties established in tort law, not contractual rights or obligations.

Regarding the 1031 Exchange provisions in the PSAs, these appear to overlap with what

is already required by law. As Plaintiffs allege, an element of Rockwell's investment scheme was

the successful implementation of 1031 Exchanges.[131] Plaintiffs allege that FA Defendants had

the duty to ensure that any disbursement complied with 1031 Exchange regulations.[132] This duty,

they aver, results from their knowledge of specific contractual provisions in the PSAs in addition

to knowledge about 1031 Exchanges generally and associated regulations and common practices

in the industry.[133] These claims are not sufficiently dependent on the PSA terms to be considered

subject to Ohio's equitable estoppel doctrine. Ohio courts require something close to a finding

that the arbitration-resisting party's claims are contingent upon contractual terms,[134] which is not

the case here.

### 2.      Intertwined Claims: Concerted Misconduct

FA Defendants next argue that the concerted misconduct estoppel theory applies. The

doctrine may be applied "where the signatory to the contract [containing the arbitration clause]

alleges substantially interdependent and concerted misconduct by both the non-signatory and one

---

[131] "In many cases, the source of a Plaintiff's investment was commercial real estate that had been held for many years, which Plaintiff sought to exchange for income producing property in a like-kind exchange under Section 1031 of the Internal Revenue Code (a '1031 Exchange')." Am. Compl. ¶ 1.

[132] Am. Compl. ¶ 408(d).

[133] "Parkin and First American knew that disbursing the escrow funds before the completion of construction would not comply with applicable rules for 1031 Exchanges and would subject Plaintiffs to risk that their funds would be misappropriated, diverted, or converted from the purpose of funding the completion of construction at the relevant [property]." *Id.*

[134] *See Javorsky v. Javorsky*, 81 N.E.3d 971, 75–76 (Ohio Ct. App. 2017) (holding that estoppel applied because signatory-plaintiff's claims were "essentially contingent" on the agreement, they did not arise "unless" the contractual element of the claim succeeded).

or more of the signatories to the contract."[135] The magistrate judge found that the doctrine did

not apply for two reasons. First, the Plaintiffs arguably did not allege "substantially

interdependent and concerted misconduct" because they raised independent claims against the

FA Defendants, who were not parties to the sales agreements.[136] Second, the magistrate judge

found that the policy underlying the concerted misconduct estoppel inapplicable here.[137] The

purpose of the doctrine "is to prevent 'arbitration proceedings between the two signatories' from

being 'rendered meaningless,' thereby thwarting 'the federal policy in favor of arbitration.'"[138]

Because the signatories waived their arbitration rights, the agreement to arbitrate was already

"rendered meaningless" and the court should avoid applying the doctrine.[139]

FA Defendants only explicitly object to the magistrate judge's first rationale.[140] FA

Defendants assert that the doctrine should apply because Plaintiffs' "Fourth, Sixth, Seventh,

Thirteenth, Fourteenth, and Fifteenth causes of action" allege "substantially interdependent and

concerted misconduct."[141] However, the magistrate judge herself acknowledged that "Plaintiffs

do raise allegations of concerted misconduct between the Rockwell parties and FA

Defendants."[142] She found that the concerted misconduct theory did not apply in light of the fact

that the signatories waived their arbitration rights and questioned whether the allegations were

sufficiently interdependent.

---

[135] *I Sports*, 813 N.E.2d at 8.
[136] Order 16.
[137] *Id.*
[138] *Id.* (quoting *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 527 (5th Cir. 2000).
[139] Order 19.
[140] Obj. 8.
[141] *Id.*
[142] Order at 16.

As an initial matter, it is noted that the concerted misconduct theory has not been adopted by any Ohio Supreme Court decision.[143] This court, like any federal court, is "reticent to expand state law without guidance from its highest court."[144] And "in predicting how a state's highest court would rule, federal courts must follow intermediate state court decisions, policies underlying applicable legal principles, and the doctrinal trends indicated by these policies."[145]

Only a few published Ohio appellate decisions reference the doctrine, let alone apply it.[146] Importantly, the leading case, *I Sports v. IMG Worldwide, Inc.*, applies pre-*Arthur Anderson* federal estoppel law, not Ohio contract law.[147] In doing so, it followed a Second Circuit opinion which held that a concerted misconduct claim requires that the estopped party assert "claims which are integrally related to the contract containing the arbitration clause."[148] Regardless, *I Sports* held that the concerted misconduct doctrine did not apply because there were no allegations that the nonsignatory parties were involved in concerted misconduct with a signatory party.[149]

---

[143] *AtriCure*, 12 F.4th at 530.
[144] *Taylor v. Phelan*, 9 F.3d 882, 887 (10th Cir. 1993).
[145] *Id.*
[146] *See I Sports*, 813 N.E.2d at 599; *Discovery Resources, Inc. v. Ernst & Young U.S. LLP*, 62 N.E.3d 714, 721 (Ohio Ct. App. 2016); *Fields v. Herrnstein Chrysler, Inc.*, 2013 WL 772822, at *7 (Ohio Ct. App. February 7, 2013) (unpublished).
[147] *Id.*
[148] *I Sports*, 813 N.E.3d at 10 (quoting *Thomson-CSF, S.A. v. Am. Arbitration. Assn.*, 64 F.3d 773, 780 (2nd Cir. 1995)). It should be noted that many of the cases *I Sports* and *Thomson* rely upon have been overruled. *E.g. Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753 (11th Cir. 1993) (overruled by *Lawson v. Life of the South Ins. Co.*, 648 F.3d 1166, 1170–77 (11th Cir. 2011) ("Many of this Court's decisions involving the question of whether a non-party can enforce an arbitration clause against a party have not made clear that the applicable state law provides the rule of decision for that question. However, the Supreme Court's 2009 decision in *Carlisle*, which postdates all of those decisions of this Court, clarifies that state law governs that question, and to the extent any of our earlier decisions indicate to the contrary, those indications are overruled or at least undermined to the point of abrogation by *Carlisle*."))).
[149] *I Sports*, 813 N.E.3d at 9–10.

Another published Ohio case, *Discovery Resources Inc. v. Ernst & Young U.S. LLP*, is inapposite. Unlike here, it involves a signatory seeking to bind a non-signatory to an arbitration agreement.[150] Other material differences distinguish the case further. In *Discovery Resources*, a plaintiff-signatory asserted claims against a defendant-signatory and a defendant-nonsignatory, alleging a conspiracy to put the plaintiff-signatory out of business.[151] The defendant-signatory and defendant-nonsignatory moved to compel arbitration, which was opposed by the plaintiff-signatory.[152] The contract containing the arbitration agreement was a services agreement, and the defendant-signatory's denial of the plaintiff's services under the contract was the central conflict of the dispute.[153] Without much explanation, the court held that because the plaintiff-signatory's central claim was that the defendants conspired with each other to put the plaintiff out of business, the concerted misconduct theory applied.[154] In so doing, it relied on a federal case that applied pre-*Arthur Anderson* federal law, which held that "a signatory . . . may be estopped from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the underlying contract."[155]

The issues that were compelled into arbitration in *Discover Resources* were more integrally connected to the underlying contract than the dispute here. There, the conspiracy turned on what was promised to the signatories in the contract. Here, the issues that FA Defendants seek to arbitrate only partially deal with what is contained in the PSAs.  It is

---

[150] 62 N.E.3d 714, 717 (Ohio Ct. App. 2016).
[151] *Id.*
[152] *Id.*
[153] *Id.*
[154] *Id.* at 721.
[155] *Id.* (quoting *Liedtke v. Frank*, 437 F. Supp. 2d 696, 699 (N.D. Ohio 2006) (citing *Javitch v. First Union Securities, Inc.* 315, F.3d 619, 629 (6th Cir. 2003))).

recognized that Plaintiffs assert a conspiracy claim against all Defendants, but the allegations against the FA Defendants center on more than just the PSAs.[156] Plaintiffs also rely on what is contained in separate escrow agreements and the FA Defendants' fiduciary duties in bringing claims against them. Accordingly, the court finds that the alleged concerted misconduct is not "integrally related to the contract containing the arbitration agreement."[157]

Moreover, the magistrate judge was correct that the underlying legal principles of the doctrine do not support its application here. First, as noted earlier, Ohio courts are clear that "[a]rbitration agreements apply to nonsignatories only in rare circumstances."[158] "Accordingly, when deciding motions to compel arbitration, the proper focus is whether the parties actually agreed to arbitrate the issue, i.e., the scope of the arbitration clause, not the general policies of the arbitration statutes."[159] Thus, the analysis centers on whether the parties agreed to the dispute, not the general policy of favoring arbitration. The question of whether the parties actually agreed to arbitrate is a state contract issue. Indeed, the Supreme Court held that in order for a non-party to an arbitration agreement to have standing to compel arbitration, state contract law must allow him to enforce the agreement.[160] Because the alternative estoppel theories

---

[156] Indeed, many of the Plaintiffs' allegations involve the improper utilization of the 1031 Exchanges and the central role the escrow account had in the investment scheme. The first paragraph of the complaint explains a common feature of most of the Plaintiffs: they often were long-time holders of commercial real estate and were attracted to the Rockwell investments to set up a 1031 Exchange in order to obtain "income producing property." Am. Compl. ¶ 1. The purpose of the 1031 Exchanges was to "hold TIC investor money in escrow until it could be disbursed to pay for land purchases or to reimburse the costs of completed construction" because 1031 Exchange money could only "be used for completed construction." Am. Compl. ¶ 3. In one of their claims for relief, Plaintiffs allege that FA Defendants "agreed to receive escrow funds in connection with each . . . transaction, but to disburse those funds to Rockwell without Plaintiff's consent and contrary to the terms of the purchase agreements." Am. Compl. ¶ 433(b). However, the conspiracy claim is only one of many claims asserted against various groups of defendants.
[157] *I Sports*, 813 N.E.3d at 10 (quoting *Thomson-CSF, S.A. v. Am. Arbitration. Assn.*, 64 F.3d 773, 780 (2nd Cir. 1995)).
[158] *I Sports*, 813 N.E.2d at 8.
[159] *Taylor*, 958 N.E.2d at 1203.
[160] *GE Energy Power Conversion France SAS, Corp v. Outokumpu Stainless USA, LLC*, 590 U.S. __, 140 S.Ct. 1637, 1643 (2020). This undermines state Federal Arbitration Act (FAA) cases that rely on federal court decisions

originate from pre-*Arthur Anderson* federal law and have only been applied sparingly in two intermediate Ohio courts, it is not clear to what extent the theories are supported by Ohio contract law. Thus, this court seeks to avoid inappropriately expanding Ohio contract law by applying alternative estoppel theories which have seldom been applied and then only in "rare circumstances."

### B.  Florida Law

Similarly, under Florida law "the doctrine of equitable estoppel . . . applies when a signatory to a contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both a non-signatory and one or more of the signatories to the agreement."[161] "In such circumstances . . . equitable estoppel will apply since there exists 'a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement.'"[162] Moreover, the doctrine relies on the same rationale: if a qualified non-party is not allowed to enforce an arbitration agreement "'the arbitration proceedings between the two

---

incorporating the federal interests of the FAA in determining who is bound by an arbitration agreement. Instead, state contract law should dictate who is bound. And even in federal courts, the concerted misconduct estoppel theory is "far from well-settled." *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 192–93 (Texas 2007) (analyzing federal circuit court decisions that applied the concerted-misconduct estoppel theory, finding that as of 2007, the doctrine only appeared in ten reported opinions and the theory was only relied upon in determining the outcome of two cases.). The leading Ohio appellate decision that describes the concerted misconduct theory, *I Sports*, relies mainly on federal cases and only cites to one Ohio Supreme Court case, *Gerig v. Kahn. Gerig* held that a signatory to a contract may enforce an arbitration provision against a nonsignatory seeking a declaration of the signatories' rights and obligations under the contract. 769 N.E.2d 381, 385-86 (Ohio 2002).

[161] *Greene v. Johnson*, 276 So. 3d 527, 531 (Fla. Dis. Ct. App. 2019) (citing *Marcus v. Florida Bagels, LLC*, 112 So. 3d 631, 633–34 (Fla. Dist. Ct. App. 2013).

[162] *Marcus*, 112 So. 3d at 634 (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2nd Cir. 2008)).

signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.'"[163]

Intertwined claims equitable estoppel has been applied in Florida's intermediate state courts more often than in Ohio courts but, like Ohio, Florida's highest court has not formally adopted it.[164] Regardless, if a party waives its right to compel arbitration through its participation in litigation or by taking action inconsistent with that right, Florida courts decline to apply estoppel to allow a nonsignatory to compel arbitration.[165] Here, as already discussed, the Rockwell Defendants waived their right to arbitration during bankruptcy court proceedings.[166] Because the doctrine is rooted in ensuring that the arbitration between the *signatories* is not rendered meaningless, a nonsignatory "may not avail himself 'of [the] arbitration provision' to which he is 'not a party by seizing upon an exception that has the primary purpose of preventing the frustration of rights that has already occurred.'"[167] Put differently, because the Rockwell Defendants already waived their arbitration rights, the FA Defendants may not utilize an exception that is centered on "preventing the frustration of rights" because that "frustration" has already occurred.

## VI.    Ohio Plaintiffs' Notice of Arbitration Agreement

FA Defendants also contend that they can compel the Ohio plaintiffs to arbitration because the FA Defendants' title policies contain arbitration agreements.[168] Each PSA required

---

[163] *Id.* (quoting *MS Dealer*, 177 F.3d at 947).
[164] *See, e.g., id.; Greene*, 276 So. 3d at 527.
[165] *Marcus v. Florida Bagels, LLC*, 112 So. 3d 631, 634–35 (Fla. Dist. Ct. App. 2013).
[166] Response to Mot. to Compel Arb. Ex. A, ECF No. 225, filed March 29, 2023.
[167] *Id.* (quoting *Ben-Yishay v. Mastercraft Dev., LLC*, No. 08-14046-CIV, 2009 WL 6387928, at *6 (S.D. Fla. Dec. 14, 2009)).
[168] Obj. 10–11.

Rockwell "to pay for an endorsement to the standard-coverage owner's policy of title insurance insuring Buyer in the amount of the Purchase Price."[169] The title policy requires that "[a]ll arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either [First American] or the Insured." All amounts in excess of that amount "shall be arbitrated only when agreed to by both [First American] and the Insured."[170]

The FA Defendants object to the magistrate judge's finding that the Ohio Plaintiffs cannot be bound by the agreement because they did not have notice of the policies.[171] The magistrate judge reasoned that because the Ohio Plaintiffs did not receive the title policies until after closing they lacked adequate notice of the arbitration provision.[172]

Under Ohio law, the "[e]ssential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and consideration."[173] "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract."[174] The usual rule is that a meeting of the minds can occur through constructive notice. "Constructive notice has been defined generally as knowledge of 'circumstances which ought to have excited apprehension and inquiry in the mind of a prudent and reasonable man.'"[175] Actual notice is not required.

---

[169] *E.g.*, First Decl. Steven J. Nielsen 3, ¶ 4.
[170] *E.g.,* First Decl. Steven J. Nielsen Ex. 47 ¶ 14.
[171] Obj. 11.
[172] Order 28.
[173] *Minster Farmers Coop Exchange Co., Inc. v. Meyer*, 884 N.E.2d 1056, 1062 (Ohio 2008).
[174] *Id.* (citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 575 N.E.2d 124, 137 (Ohio 1991)).
[175] *Rudolph v. Wright Patt Credit Union*, 175 N.E.3d 636, 649 (Ohio Ct. App. 2021) (quoting *Varwig v. Railroad Co.*, 44 N.E. 92, 94 (Ohio 1896).

However, Ohio recognizes context-specific rules in determining the validity of title insurance contracts.[176] In the absence of negotiations for special rules or conditions, such insurance contracts "are presumed to have intended that the ensuring policy would include the usual and customary provisions found in similar title insurance policies."[177] Thus, even if the policy is delivered after closing, the parties often have constructive notice because it is presumed that the usual and customary provisions would be included. "To the extent that it contains the usual and customary terms, the policy is simply a reflection of the parties' intent and a memorial of their agreement."[178] Conversely, where a title policy contains deviations from usual and customary terms, Ohio law requires delivery of a title policy prior to closing in order for nonstandard terms to be binding.[179]

Because this is a title insurance contract dispute, the determination is dependent on whether FA Defendants' policies contained terms that were "usual and customary." If the court determines that they were, Plaintiffs would be bound by assent through constructive notice.[180] The court turns to the FA Defendants' objections to the magistrate judge's finding that the arbitration clauses were not usual and customary.

---

[176] *Henderson v. Lawyers Title Ins. Co.*, 843 N.E.2d 152, 156–157 (Ohio 2006).
[177] *Id.* at 157.
[178] *Id.*
[179] *Id.*
[180] FA Defendants ask that this court follow *DiTucci v. Ashby* because the facts are similar and even involve some of the same parties. *DiTucci*, however, is a federal district court case that applied Indiana law, not Ohio law. *DiTucci v. Ashby*, 2021 WL 778579 (D. Utah March 1, 2021). The decision does not analyze the usual and customary terms doctrine, nor is it clear whether Indiana has even adopted the doctrine. The court respectfully declines to follow the reasoning provided in the case.

**VII.    Whether Arbitration Provisions are Usual and Customary Terms of Title Policies**

FA Defendants first object to the magistrate judge's reliance on *Henderson v. Lawyers Title Insurance Company*, the leading Ohio Supreme Court case on constructive notice and title insurance contracts.[181] They contend that the case was limited to "run-of-the-mill 'residential real estate transactions.'"[182] Thus, they argue, because this case deals with "sophisticated tax and commercial real estate transactions" and "sophisticated real estate investors," *Henderson* should not apply.[183]

*Henderson* involved a purchase and sale agreement for a home.[184] Plaintiffs signed a purchase and sale agreement, which provided that the title insurance premium be split between the buyer and seller.[185] The real estate broker provided the title insurance company a copy of the contract and requested that a commitment for title insurance be issued to the plaintiffs.[186] The plaintiffs never received a copy of the commitment and only received their title policy after closing.[187] The court held that "a title insurance policy that is issued in response to an unqualified request for coverage, but is not delivered to the insured until after the closing, is binding to the extent that it contains the usual and customary terms found in similar policies."[188]

Far from limiting the doctrine to sophisticated, commercial transactions, *Henderson* instead ruled that for the usual and customary terms doctrine to apply, the parties must have

---

[181] Obj. 12; *see Henderson*, 843 N.E.2d at 152.
[182] Obj. 12 (quoting *Henderson*, 843 N.E.2d at 156).
[183] *Id.*
[184] *Henderson*, 843 N.E.2d at 265.
[185] *Id.*
[186] *Id.*
[187] *Id.*
[188] *Id.* at 268.

contracted for a standard policy of title insurance.[189] That is exactly what the parties contracted

for here: a "standard-coverage owner's policy."[190] This is an "unqualified request for coverage,"

lacking requests for special terms or conditions.[191] Moreover, it is the unique features of title

insurance policies that drove *Henderson*'s analysis, not the residential nature of the underlying

transaction or the experience of the parties.[192] Indeed, the Ohio Supreme Court relied on amicus

briefing explaining that "[t]itle insurance coverage is provided for a continuing and indefinite

period of time in exchange for a one-time premium payment, without the need to renew the

policy. On the other hand, property and casualty insurance coverage is provided for a relatively

short specified policy period, subject to renewal for additional periods upon the agreement of the

insured and the insurer and the payment of additional premiums."[193] Because the conflict centers

on a contract for a standard title insurance policy, the court sees no reason why *Henderson*

should not apply here.

Second, FA Defendants raise procedural objections to the magistrate judge's order. They

contend that the magistrate judge "failed to recognize the April 12, 2023 Declaration of Steven J.

Nielsen [ECF No. 227], which was the only evidence in the record addressing [the *Henderson*]

standard before the June 20, 2023 hearing."[194] They allege that instead of only considering the

April 12, 2023 Declaration, the magistrate judge allowed Plaintiffs to present new evidence and

---

[189] *Henderson*, 843 N.E.2d at 157.
[190] *See, e.g.,* First Decl. Steven J. Nielsen Ex. 1 ¶ 4.
[191] *Henderson*, 843 N.E.2d at 157.
[192] *See Henderson*, 843 N.E.2d at 160.
[193] *Id.*
[194] Obj. 12–13.

struck FA Defendants' rebuttal evidence. The new evidence presented was a "form 2021 ALTA

Owner's Policy, and . . . an Owner's Policy Comparison Chart."[195]

The court reviews the procedural history leading up to the June 20, 2023 hearing. The

events which Plaintiffs aptly describe as the "briefing odyssey" began when Plaintiffs first

identified the "usual and customary terms" issue in their objection to FA Defendants' Motion to

Compel.[196] To support their argument, they offered supplementary evidence.[197] FA Defendants

responded to these arguments in their reply briefing filed on April 12, 2023, [198] and similarly

filed a supplementary April 12, 2023 Declaration of Steven J. Nielsen.[199] The same day,

however, FA Defendants filed an evidentiary objection to the Plaintiffs' supplementary

evidence.[200] Plaintiffs responded to the objection to their evidence on May 31, 2023.[201] FA

Defendants then objected to Plaintiff's response because Plaintiffs did not meet their deadline.[202]

These motions were all addressed during the June 20, 2023 hearing before the magistrate judge.

The Order explains what happened during and after the hearing.

> As an initial matter, only the parties' original arguments, evidence, and
> briefing is considered in making this determination. At the June 20 hearing,
> Plaintiffs submitted additional evidence in support of their position that arbitration
> clauses are not usual and customary in the title policy industry. *See* Exs. Regarding
> 243 Motion Hearing, ECF No. 244. Because this evidence was presented for the
> first time at the hearing, the FA Defendants were afforded an opportunity to
> respond. *See* Minute Entry, ECF No. 243. But they were advised any response must
> be in the vein of a response to a notice of supplemental authority. *See* DUCivR 7-
> 1(c). The court did not invite new evidence. The FA Defendants ignored this
> directive, instead submitting three supplemental filings, including new evidence in

---

[195] ECF No. 244 Exs. 2 & 3.
[196] Pls.' Opp'n to Renewed Mot. to Compel Arb. 11–19, ECF No. 225, filed March 29, 2023.
[197] *Id.* Ex. B.
[198] Defs.' Reply in Support of Renewed Mot. to Compel Arb. 8–9, ECF No. 226, filed April 12, 2023.
[199] Second Decl. Steven J. Nielsen.
[200] Obj. to Evid., ECF No. 228, filed April 12, 2023.
[201] ECF No. 236.
[202] ECF No. 239.

the form of additional declarations.[203] Without court authorization, Plaintiffs responded in kind, submitting two supplemental filings with new declarations and other new evidence from web sources.[204] These supplemental filings were unauthorized by the rules and far exceed the scope of the limited supplemental briefing permitted by the court. Where this issue can be resolved on the parties' initial briefing alone, and the submission of additional briefing and evidence was unauthorized and unjustified, none of the additional evidence submitted at the hearing or with the parties' supplemental filings is considered.[205]

The court finds nothing objectionable here. The magistrate judge granted leave for supplemental briefing responding to new legal authority. The court did not invite new evidence.[206] The parties failed to comply with her order. The magistrate judge did not err by not considering briefings that were beyond the scope of the order. Moreover, the magistrate judge explicitly stated that only the parties' "original arguments, evidence, and briefing" was considered in making her determination.[207] In other words, she considered the April 12, 2023 Declaration and nothing filed thereafter.

FA Defendants further argue that even without the later briefings, the April 12, 2023 Declaration "indisputably established that arbitration provisions were usual and customary terms

---

[203] *See* FA Defs.' Suppl. Brief in Support of Renewed Mot. to Compel Arbitration, ECF No. 245, filed June 27, 2023; Third Decl. of Steven J. Nielsen in Support of Defs.' Suppl. Brief and Mot. to Compel Arbitration, ECF No. 246, filed June 27, 2023; FA Defs.' Resp. to Pls.' Suppl. Mem. and Objection to Evidence, ECF No. 251, filed July 19, 2023; Fourth Decl. of Steven J. Nielsen in Support of FA Defs.' Objection to Evidence, ECF No. 252, filed July 19, 2023; FA Defs' Resp. to Pls.' Obj. to Fourth Decl. of Steven J. Nielsen & Obj. to FA Defs.' Resp., ECF No. 254, filed July 26, 2023.

[204] *See* Pls.' Suppl. Mem. & Obj. to Evid. in Opp'n to FA Defs.' Mot. to Compel Arb., ECF No. 250, filed July 12, 2023; Pls.' Obj. to Fourth Decl. of Steven J. Nielsen and Obj. to FA Defs.' Resp., ECF No. 253, filed July 26, 2023.

[205] In footnote 211 of the Order, the magistrate judge explained that "[g]enerally, parties 'should be given an opportunity to respond to new material,' such as new evidence and legal arguments. *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005). However, if the court 'does not rely on the new material in reaching its decision,' it may also decline to consider any response to the new material. *Id.*'"

[206] Defendants argue that the magistrate judge may have granted leave to respond to "[a]nything that was raised at the hearing." Obj. 2–3 (quoting Tr. 12:8–18, ECF No. 261, filed October 13, 2023). However, the court's minute entry for the proceedings at the June 20, 2023 hearing explicitly states that "Defendant may submit five pages of supplementary briefing." ECF No. 243. Leave was not granted to file new evidence, even if there was some ambiguity in the transcript due to "portions of the recording being inaudible or silent." Tr. 2:18–19.

[207] Order 48.

in Ohio title policies during the years the TIC transactions occurred" and "[t]his undisputed evidence was sufficient to compel arbitration."[208] FA Defendants contend that the magistrate judge erred by making a factual finding that the arbitration clauses in the Ohio policies were not usual and customary, contrary to what is suggested by the evidence presented in the April 12, 2023 Declaration. The court first reviews the usual and customary standard as explained in *Henderson* and then turns to the April 12, 2023 Declaration.

In *Henderson*, the Ohio Supreme Court determined that an insurance company's varying inclusion of an arbitration clause "is hardly sufficient evidence of a usual and customary practice."[209] Similar to FA Defendants' argument, the defendant in *Henderson* argued that all ALTA insurance policies included arbitration agreements "'since at least 1987.'"[210] However, the court noted that the vice president of the company testified that "an arbitration clause appears in the last three of the five form policies that were promulgated by ALTA and approved by the Ohio Department of Insurance . . . [and] it was the practice of [the company] . . . to issue the most recently approved ALTA policy when a customer made an unconditional request for an owner's policy of title insurance."[211] All five ALTA policies were available for purchase from the title insurance company.[212] A company representative stated that it was standard practice for the company to issue the most recent ALTA policy (which contained an arbitration clause), but other older versions that lacked an arbitration clause were also sold to customers. Thus, the

---

[208] Obj. 13; *id.* at 14 ("It was clear error for her not to consider this [supplemental] evidence and deny the Motion."); *Id.* at 13 ("This undisputed evidence [referring to the April 12 Declaration] was sufficient to compel arbitration.").
[209] *Henderson*, 843 N.E.2d at 157–58.
[210] *Id.* at 157.
[211] *Id.*
[212] *Id.*

evidence was not "that the more recent ALTA policies, which contain arbitration clauses, have supplanted the previous policies."[213]

Further, the title insurance issuer in *Henderson* argued that "usual and customary does not imply unvarying use."[214] The court noted that "even a broadly construed definition of 'usual and customary' . . . tolerates some degree of practical variation" but a title insurance company still must establish some degree of "consistency and regularity in order to retain its essential meaning."[215] The court determined that because the ALTA policies variably contained arbitration clauses and because the company deleted arbitration clauses on request at no further cost, the evidence presented was "hardly sufficient evidence of a usual and customary practice."[216]

The court turns to whether FA Defendants met their burden in demonstrating that their terms were the usual and customary practice. Because FA Defendants' usual and customary terms argument is necessary to determine the existence of an enforceable arbitration agreement, FA Defendants must present "sufficient evidence to demonstrate the existence of an enforceable agreement."[217] Plaintiffs, as the non-movants, are given the benefit of all reasonable doubts and inferences that may arise.[218] If the court determines that the FA Defendants' met their initial burden, the burden shifts to the Plaintiffs to "establish[] a genuine dispute as to whether the arbitration provisions apply."[219] "This framework is similar to summary judgment practice."[220]

---

[213] *Id.*
[214] *Id.* at 158.
[215] *Id.*
[216] *Id.* at 158.
[217] *BOSC, Inc. v. Bd. of Cnty. Comm'rs of Cnty. Of Bernalillo*, 853 F.3d 1165, 1177 (10th Cir. 2017).
[218] *Hankcock v. American Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012).
[219] *Id.*
[220] *Id.*

35

In Defendants' April 12, 2023 Declaration, Steven J. Nielsen asserts that because it has been "the standard practice of all large title companies . . . to issue policies for commercial property transactions based on the most recently approved ALTA Owner's Policy" and because the most recently approved ALTA policy contained an arbitration provision, the inclusion of an arbitration provision was (and still is) the standard practice in the industry.[221] Thus, "when First American issued title policies that . . . included the arbitration provision just as ALTA had promulgated it in 2006," the arbitration provision included was the usual and customary practice of the industry.[222] Missing from the Declaration, however, are facts describing what the arbitration clause in the 2006 ALTA Owner's Policy provided.

Just because the 2006 ALTA Owner's Policy includes "an arbitration clause" does not mean that all arbitration clauses are usual and customary in the industry. For example, unlike First American's policies for the Ohio transactions, which allow for a unilateral demand for arbitration, the policies First American issued for the Florida transactions provide that "arbitration . . . may be demanded if agreed to by *both* the Company and the Insured at the time of a controversy or claim."[223] As the magistrate judge explained, such an arbitration clause does not add any additional rights beyond what would be permitted in its absence.[224] Thus, because one party can unilaterally avoid arbitration, the Florida agreements effectively contain no arbitration agreement.[225] The April 12, 2023 Declaration does not explain or provide what the

---

[221] Second Decl. Steven J. Nielsen ¶ 5.
[222] *Id.* ¶ 6.
[223] First Nielsen Decl. 6 ¶ 14 (emphasis added), ECF No. 220.
[224] Order 47.
[225] *Id.*

2006 ALTA Owner's Policy's arbitration clause entailed.[226] Without that information, the court cannot determine what the usual and customary terms are and whether the Ohio policies conformed to those terms.[227]

First American's provided insufficient evidence to demonstrate that their arbitration clauses in the Ohio polices conformed to the usual and customary practice sufficient to give Plaintiffs constructive notice of their existence.[228]


## ORDER

FA Defendants' Objections[229] are OVERRULED and the magistrate judge's Memorandum and Order[230] is adopted as set forth above. FA Defendants' Renewed Motion to Compel Arbitration[231] is DENIED.

---

[226] For example, it is not explained whether the ALTA arbitration clause provides for the same $2,000,000 limitation in the Ohio policies.

[227] The Declaration also does not explain why Mr. Nielsen would know the standard practices of all major title insurance companies, as opposed to First American's practices.

[228] Additionally, while the court does not consider the substance of the additional competing declarations excluded by the magistrate judge, the parties' belated efforts to supplement the record with dueling declarations strongly suggest that a decision to compel arbitration would require additional development of the evidentiary record.

[229] ECF No. 263.

[230] ECF No. 258.

[231] ECF No. 219, filed March 3, 2023.

Signed May 8, 2024.

BY THE COURT

_____

David Barlow
United States District Judge